Edward C. CROCKETT, Individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Harry GREEN, Sr., et al., Defendants.

Civ. A. No. 73-C-665.

United States District Court,
E. D. Wisconsin.

Feb. 3, 1975.

Richard M. Klein, Milwaukee Legal Services, Inc., Milwaukee, Wis., and Dennis R. Yeager & Mayer G. Freed, Nat. Employment Law Project, New York City, for plaintiffs.

James B. Brennan, City Atty., by Patrick B. McDonnell, Asst. City Atty., Milwaukee, Wis., for defendants.

## OPINION AND ORDER

JOHN W. REYNOLDS, Chief Judge.

On December 12, 1973, the named plaintiff commenced this class action under 42 U.S.C. §§ 1981 and 1983 seeking declaratory and injunctive relief from certain employment practices of the defendant officials of the City of Milwaukee. Plaintiffs charge defendants with unlawfully denying blacks equal employment opportunities with respect

to "skilled craft" positions of the City of Milwaukee and the Board of School Directors of the City of Milwaukee. On December 19, 1973, the parties consented to the entry of a temporary restraining order enjoining defendants from permanently filling any positions in the skilled craft classification pending a decision on plaintiffs' motion for a preliminary injunction. On January 3, 1974, defendants answered denying unlawful discrimination.

Plaintiffs presently seek a preliminary injunction restraining the alleged discriminatory employment practices of the defendants with respect to the "skilled craft" positions and request the imposition of ratio hiring requirements to remedy the effects of the past discriminatory practices. This court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1343(3) and (4) and the Equal Protection Clause of the Fourteenth Amendment. Declaratory relief is also sought under 28 U.S.C. §§ 2201 and 2202.

The factual basis for plaintiff's motion for preliminary injunction is set forth in two stipulations of uncontested facts (hereinafter "stipulation") and the verified complaint. The stipulations resolve all matters of factual controversy between the parties and constitute the basis of this court's findings of fact. Based on the findings of fact, this court concludes that, as a matter of law, defendants have engaged in discrimination in the selection of skilled craft labor for the City of Milwaukee and the Board of School Directors, and that ratio hiring is necessary to remedy the effects of the past discriminatory practices of the defendants.

## I. FINDINGS OF FACT

The named plaintiff, Edward C. Crockett, is a black adult and resident of the City of Milwaukee. On March 25, 1969, Crockett completed an apprenticeship at the trade of bricklayer and mason. Crockett was the first black to complete the apprenticeship in this trade in the City of Milwaukee. On September 22, 1973, Crockett was notified by the City Service Commission that a position was available as a bricklayer for the Milwaukee Board of School Directors. He immediately applied for the position and was thereafter advised that his application had been "reviewed and accepted." Crockett was directed to report for a practical performance examination (Stipulation ¶ 9). On December 7, 1973, Crockett was informed by the City that his application did not satisfy the experience requirement for bricklayers and therefore his application would not be accepted. On December 8, 1973, Crockett went to the location for the practical performance examination and was again advised that he would not be permitted to take the examination because he did not have five years' experience as a journeyman bricklayer after completion of an apprenticeship.[1] On December 12, 1973, Crockett commenced this action on behalf of himself and others similarly situated. On May 3, 1974, this court granted Crockett's motion for maintainability of the action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the class defined as follows: all blacks who are either capable of performing the work in the "skilled craft" positions of the City of Milwaukee or the Board of School Directors of the City of Milwaukee or capable of being trained to perform said work and who have been or will be denied employment in said "skilled craft" positions because of their race.

Defendants Harry Green, Sr., Eydie V. Watts, Ralph W. Koenig, Mrs. Anthony J. Scholter, and Clifford L. Matchey are members of the Board of the City Service Commissioners of the City of Milwaukee. As members of the Board, they are responsible for the adoption and administration of the Milwaukee Civil Service Commission, § 63.18 et seq., Wis. Stats. (1971), including the examination

---

1. On March 28, 1974, the City Service Commission eliminated the five-year post-apprenticeship experience requirement for bricklayers. However, the City has apparently retained the experience requirements for other "prevailing wage" skilled craft positions. (Stipulation ¶ 52)

and certification of persons seeking employment with the City of Milwaukee. Defendant Robert C. Garnier is the City Personnel Director and Secretary of the Board. He is responsible for the administration of " * * * city civil service law and rules and the personnel statutes and ordinances ·governing city service employment * * *." § 63.30, Wis. Stats. (1971). The Board of School Directors of the City of Milwaukee is the public body responsible for the management and control of the Milwaukee public schools pursuant to § 119.01 et seq., Wis.Stats. (1971), and is the agency which requests certification of a list of eligible persons for various "skilled craft" positions within the school system.[2]

"Skilled craft" workers are examined and certified by the City Service Commission for two separate municipal employers: the City of Milwaukee itself and the Board of School Directors of the City of Milwaukee. (Stipulation ¶ 15) The City Service Commission uses the following definition of "skilled craft" in determining the job titles to be included in the skilled craft category:

> "*Skilled Craft Workers:* Occupations in which workers perform jobs which require special manual skill and a thorough and comprehensive knowledge of the processes involved in the work which is acquired through on-the-job training and experience or through apprenticeship or other formal training programs. Includes: mechanics and repairmen, electricians,

heavy equipment operators, stationary engineers, skilled machining occupations, carpenters, compositors and typesetters and kindred workers."

A list of the skilled craft positions for the City of Milwaukee as of August 24, 1973, is annexed to this opinion as Exhibit 1(a)–1(b). A list of the skilled craft positions for the Board of School Directors as of April 8, 1974, is annexed as Exhibit 2.

For purposes of analyzing job qualifications, "skilled craft" workers employed by the City of Milwaukee or the Board of School Directors are divided into two categories—"prevailing wage" employees and "fixed wage" employees. "Prevailing wage" employees are persons working primarily in the building trades. For employment as a "prevailing wage" employee, the City Service Commission has generally required that the person have completed a formal apprenticeship in the specific trade and have a designated number of years experience as a journeyman following completion of the formal apprenticeship. "Fixed wage" employees are persons who are trained to perform the work in question by education and training conducted by the department of the City employing them instead of an apprenticeship program conducted by an agency separate from the City of Milwaukee. Neither the City of Milwaukee nor the Board of School Directors is engaged in formal apprenticeship programs for training "prevailing wage" employees with the exception of electrical mechanics. The building trade unions in

---

**2.** The Board of School Directors for the City of Milwaukee is named as a defendant in this action. However, even though the Board has admitted jurisdiction in paragraph 1 of its answer to plaintiffs' complaint and has never questioned this court's jurisdiction over it, it is the duty of the district court to see that its jurisdiction, which is defined and limited by statute, is not exceeded. Louisville & Nashville Ry. Co. v. Mottley, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908). In Kelly v. Wisconsin Interscholastic Athletic Ass'n, 367 F.Supp. 1388, 1391 (E.D.Wis. 1974), this court, relying on City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L. Ed.2d 109 (1973), specifically held that the

Board of School Directors for the City of Milwaukee, the same defendant here, is not a "person" within the meaning of 42 U.S.C. § 1983 even where only equitable relief is sought. Consequently, the Board of School Directors is not a proper party defendant in this action and must be dismissed. The dismissal of the Board does not affect the propriety of the equitable relief provided in this order, since the equitable relief runs only to the individually named plaintiffs. Plaintiffs may be entitled to amend their pleading at a subsequent date to name the individual members of the Board if they deem it necessary.

the Milwaukee area are the only source of journeymen who have completed a formal apprenticeship in quite a number of skilled craft positions.[3] (Stipulation ¶ 20) Consequently, these building trade unions are the only source of "prevailing wage" employees under the present qualifications used by the City of Milwaukee.

In 1970, one per cent of the persons employed in the building trades as craftsmen in the construction industry in the Milwaukee Standard Metropolitan Statistical Area (hereinafter "S.M.S.A.") were black according to the Equal Employment Opportunity Report, Job Patterns for Minorities and Women in Private Industry, Vol. 2, p. 462, and Volume 1, p. xxi. (Stipulation ¶ 21)

Of the total of 1,239 persons employed in all skilled craft positions in the departments of the City of Milwaukee and the Board of School Directors as of August 24, 1973, 38 were black (3.1%). (Stipulation Exhibits 7a–7b and 8; Exhibits 1(a), 1(b), and 2 herein.) With respect to skilled craft positions which require a formal apprenticeship (Stipulation ¶ 20 and Exhibits 1(a), 1(b) and 2 herein), none of the 72 City of Milwaukee employ-

ees are black and 2% of the 164 Board of School Directors employees are black. The population of the City of Milwaukee as of April 1973 was 17.2% black. (Stipulation, Exhibit 12)

## II. CONCLUSIONS OF LAW

### A. *Plaintiffs' Prima Facie Case of Discrimination*

A substantial disparity between the proportion of minorities in the general population and the proportion in a specific job classification is sufficient to establish a prima facie case of discrimination. Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970); Carter v. Gallagher, 452 F.2d 315, 323 (8th Cir. 1971); Erie Human Relations Commission v. Tullio, 357 F.Supp. 422 (W.D.Pa.1974); 493 F.2d 371 (3rd Cir. 1974). Discrimination need not be deliberate or intentional. The contrast between the percentage of black population of the City of Milwaukee (17.2%) and the percentage of black composition of defendants' 1,239 skilled craft positions (3.1%) constitutes a substantial statistical discrepancy and, consequently, establishes a prima facie case

---

3. A formal apprenticeship is required for the following skilled craft job classifications:

| City of Milwaukee | Board of School Directors |
|---|---|
| (From Exhibit 1(b) attached) | (From Exhibit 2 attached) |
| Bricklayer, Buildings | Blacksmith |
| Carpenter | Boilermaker |
| Firebrick Mason | Bricklayer |
| Ironworker | Carpenter |
| Painter | Painter |
| Painter Chargeman, House | Plasterer |
| Painter, Bridge and Iron | Plumber |
| Painter Chargeman, Bridge & Iron | Sign Painter |
| Sewer Mason | Sheet Metal Worker |
| Carpenter Foreman | Steamfitter |
| Ironworker Foreman | Steamfitter Refrigeration |
| Painter Foreman, House | Steamfitter Welder |
| Painter Foreman, Ironwork | Carpenter Chargeman |
| | Electrical Chargeman |
| | Plasterer Chargeman |
| | Plumbing Chargeman |
| | Sheet Metal Chargeman |
| | Steamfitter Chargeman |
| | Carpenter Foreman |
| | Electrical Foreman |
| | Painter Foreman |
| | Plumbing Foreman |
| | Sheet Metal Foreman |
| | Steamfitter Foreman |

of unlawful racial discrimination. The showing of a prima facie case shifts the burden to the defendants of showing that the statistical discrepancy results from causes other than racial discrimination. N.A.A.C.P. v. Civil Service Commission of City and County of San Francisco, 6 C.C.H. E.P.D. ¶ 8956 (N.D. Cal.1973); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971). Defendants in this case have offered no explanation for the disproportionate number of blacks in the "fixed wage" skilled craft positions for which defendants conduct their own training. Therefore, plaintiffs' case with respect to "fixed wage" employees is conclusive.

B. *Apprenticeship and Experience Requirements*

The principal contention between the parties involves the "prevailing wage" skilled craft positions, and specifically the "apprenticeship" and "experience" prejob requirements employed by the defendants. As noted above, as a condition of employment as a "prevailing wage" employee, the defendants generally require that the person have completed a formal apprenticeship in the specific trade and have a designated number of years experience as a journeyman following completion of the formal apprenticeship.

In attacking both the "apprenticeship" and "experience" prejob qualifications, plaintiffs rely on Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In *Griggs,* the United States Supreme Court held that, irrespective of discriminatory intent, once any job requirement is shown to have a disproportionate effect of excluding minorities, the burden shifts to the employer to demonstrate that the job requirement is a "business necessity." While *Griggs* arose under Title VII of the Civil Rights Act of 1964 and the present case arises under 42 U.S.C. §§ 1981 and 1983, rather than Title VII, the same principle is controlling. Carter v. Gallagher, supra; Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir.

1972); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972).

Plaintiffs have established that both the apprenticeship and experience requirements have a disproportionate impact upon blacks. Neither the City of Milwaukee nor the Board of School Directors is engaged in formal apprenticeship or journeymen programs. The building trade unions are the only source of craftsmen possessing the required apprenticeship and journeymen qualifications. As only 1% of the persons employed in the building trades as craftsmen in the construction industry in the Milwaukee S.M.S.A. in 1970 were black (Stipulation ¶ 21) and as few blacks completed formal apprenticeships in the skilled trades (Stipulation, Exhibit 11-C), defendants' requirements for completion of a formal apprenticeship and post-apprenticeship journeyman experience excludes a disproportionate number of blacks from the "prevailing wage" skilled crafts, regardless of their qualifications. In addition, this disproportionate impact upon blacks is statistically verifiable in view of the fact that with respect to skilled craft positions which require a formal apprenticeship (Stipulation ¶ 20 and Exhibits 1(a), 1(b) and 2 attached hereto), none of the 72 City of Milwaukee employees are black, and only 2% of the 164 Board of School Directors' employees are black.

Defendants contend that the apprenticeship and experience requirements do not have a statistically disproportionate effect on blacks in view of the fact that as of December 1, 1973, there was over 14% black participation in the bricklayers apprenticeship program in the Milwaukee S.M.S.A. (Stipulation, Exhibit 11-A) Consequently, defendants assert that the burden of showing the job relatedness or necessity of these requirements never shifts to them. The defendants misconceive the present situation. Based upon the past discrimination against blacks in the trade unions, whether intentional or not, the apprenticeship and experience requirements are barriers to blacks who are presently applying for jobs with the City. The

fact that the requirements may not discriminate against blacks in the future is irrelevant. Few, if any, blacks presently qualify for "prevailing wage" skilled craft positions with the City of Milwaukee as a direct consequence of the past practices of the trade unions which have the effect of discriminating against blacks. Consequently, the City's present employment practices serve to perpetuate the past practices of the trade unions which effectuate discrimination.

C. *Business Necessity Test of Equal Protection*

 Once it is established that the apprenticeship and experience requirements have a disproportionate adverse impact on minorities, the burden shifts to the defendants to justify the continued use of the requirements despite their discriminatory effect. Griggs v. Duke Power Co., supra; Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, 482 F.2d 1333 (2d Cir. 1973); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971). The extent of this burden of justification depends upon the particular test of equal protection which the court invokes. In treating cases involving racial discrimination in public and private employment, courts have generally declined to apply either the "compelling governmental interest" or the "rational relationship" tests of equal protection. Rather, the courts have created a special test of equal protection in employment cases of "business necessity." That is, an employment practice which operates to exclude blacks may be retained only upon a showing of a legitimate, nondiscriminatory "business necessity" for the practice. Griggs v. Duke Power Co., supra; N.A.A.C.P. v. Civil Service Commission of City and County of San Francisco, 6 C.C.H. E.P.D. ¶ 8956 (N.D.Cal.1973). This standard places a "heavy burden" of justification on the defendant. Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, supra.

 Under this test of equal protection, the initial and minimal justification which the defendants must demonstrate is that the particular employment practices are related to job performance, i. e., "job-related." Griggs v. Duke Power Co., supra. Courts confronted with challenges to public employment practices predicated upon the equal protection clause have generally agreed that the "Testing and Selecting Employees Guidelines" (hereinafter "Guidelines") issued by the Equal Employment Opportunity Commission (hereinafter "E.E.O.C.") provide persuasive standards for evaluating claims of job-relatedness. Castro v. Beecher, 459 F.2d 725, 729 (1st Cir. 1972); Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, supra. Under the E.E.O.C. Guidelines, in order to be job-related, prejob requirements or tests must be professionally validated. 32 C.F.R. § 1607.4(c). The employer can demonstrate job-relatedness by either "predicative validation" or "content validation." Predicative validation requires substantial evidence that there is a correlation between a test or job requirement and an employee's *actual* performance on the job. Content validation requires employers to demonstrate that they have formulated examination questions and preliminary requirements based upon an empirical analysis of the requirements of the job. This job analysis is normally conducted by experts in the field. Chance v. Board of Examiners, 458 F.2d 1167, 1174 (2d Cir. 1972). Content validation may be used only when the use of predicative validation studies are not feasible. 32 C.F.R. § 1607.5(b)(1).

 The defendants have submitted extensive affidavits, including affidavits of an industrial psychologist and an expert in the field, in an effort to demonstrate the "content validity" of the apprenticeship requirement and the practical examination for bricklayers. However, even assuming that "content validation" is a permissible method of validation under these circumstances and further assuming, without deciding, that the apprenticeship and experience requirements have been shown to have content validity, the defendants have not sustained their burden of justification

for the continued use of the prejob requirements. While proof of content or predicative validity of a particular job requirement establishes that the requirement has a business *purpose*, mere validation is not sufficient to establish that a purposeful requirement is a *necessity*.

### D. *No-Alternative Approach to Business Necessity*

Professional validation is but a part of the "business necessity" justification which an employer must demonstrate to retain employment practices with an adverse impact on blacks. Harper v. Mayor & City Council of Baltimore, 359 F.Supp. 1187 (D.Md.1973). An employment practice which adversely affects blacks must be eliminated if it is not necessary to the conduct of the business. Griggs v. Duke Power Co., supra; Robinson v. Lorillard Corporation, 444 F.2d 791 (4th Cir. 1971). Business necessity requires more than a showing that the policies serve management functions. "Necessity connotes an irresistable demand." United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir. 1971). A business necessity test of equal protection requires not only validation of requirements and tests but also a demonstration by the employer that there are no available alternatives to the tests or requirements which have a lesser racial impact. Wallace v. Debron Corp., 494 F.2d 674 (8th Cir. 1974); United States v. St. Louis-San Francisco Ry. Co., 464 F.2d 301 (8th Cir. 1972); Harper v. Mayor & City Council of Baltimore, 359 F.Supp. 1187 (D.Md.1973). No practice is "necessary" unless no reasonable alternative to the action exists. As stated by the Court in Robinson v. Lorillard Corporation, 444 F.2d 791, 798 (4th Cir. 1971):

"* * * The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. * * * [A]nd there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact."

In addition the E.E.O.C. Guidelines, which this court finds persuasive in § 1983 actions, gives further support to this interpretation of business necessity. Section 1607.3 of 29 C.F.R. provides that the use of any tests or requirements which adversely affect the hiring of minorities constitutes discrimination unless (1) the tests or requirements have been properly validated, *and* (2) the person acting upon the results of a particular test or requirement can demonstrate that alternative suitable hiring procedures are unavailable.

Literally applied, the "no-alternative" approach to "business necessity" in the case law and the E.E.O.C. Guidelines, 29 C.F.R. § 1607.3, places upon an employer the practically impossible burden of proving an absolute negative, i. e., the nonexistence of any alternative procedures. A fair and preferable allocation of the burden of proof on the existence of alternatives would place upon the plaintiff the burden of initially proposing or suggesting reasonable alternative practices while leaving to the employer the ultimate burden of demonstrating that any suggested alternatives are not adequate substitutes for its present practices. However, in the present case, defendants have failed to sustain their burden regardless of how that burden with respect to the existence of alternative practices is allocated.

Plaintiffs have suggested that a practical performance examination will serve as a viable alternative to the present apprenticeship and experience requirements. Defendants offer no evidence that they are unable to eliminate the apprenticeship and experience requirements and develop a valid practical performance examination which will adequately measure an applicant's skills. The affidavit of Lynn W. Ference, an industrial psychologist, contains a detailed procedure employed by the City of Milwaukee for the development of a bricklayer performance examination. The defendants have not shown why such practical performance examinations would not serve

as an adequate substitute for the apprenticeship and experience requirements or why the apprenticeship and experience requirements are "necessary" in light of the availability of such examinations.

██ The only possible justification offered by the City for retaining the apprenticeship and experience pre-examination requirements is the cost factor. The apprenticeship and experience requirements are used as a screening device so that defendants are spared the cost of administering a practical performance examination to a large number of applicants, many of whom may not possess even minimal qualifications. However, in Robinson v. Lorillard Corporation, 444 F.2d 791, 799 (4th Cir. 1971), the court held that while considerations of economy and efficiency will often be relevant to determining the existence of business necessity, "dollar cost alone is not determinative." See also Johnson v. Pike Corporation of America, 332 F.Supp. 490 (D.Cal.1971). There is no reason to believe that the City could not develop alternative screening devices with a lesser racial impact than the apprenticeship and experience requirements. Consequently, the retention of the apprenticeship and experience pre-examination requirements constitutes a discriminatory employment practice.

### III. RELIEF

Preliminary relief is appropriate at this stage of the proceedings. The record before this court, as the foregoing discussion indicates, establishes that plaintiffs are extremely likely to prevail on the merits. Failure to grant the preliminary relief would lead to immediate and irreparable injury to plaintiffs, as existing vacancies in the various skilled craft positions may be filled by permanent appointment, thereby precluding effective final relief. Since no remedy ordered by the court will require the hiring of any individuals not qualified

for a particular job, neither the defendants nor the public will be injured by the affirmative relief.

In their motion for preliminary injunction, plaintiffs request the imposition of ratio hiring of qualified blacks with respect to skilled craft vacancies of the City of Milwaukee and the Board of School Directors to remedy the effects of the past discriminatory practices of the defendants. Plaintiffs seek such interim affirmative relief pending final determination of the merits or until the proportion of blacks in each "skilled crafts" classification equals the proportion of blacks in the City of Milwaukee.

██ The district court, sitting as a court of equity, has wide discretion to fashion its decree, not only to prohibit present discrimination but also to eradicate the effects of past discrimination. Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971); United States v. Wood, Wire & Metal Lathers, Local 46, 471 F.2d 408 (2d Cir. 1973). This power includes the authority to construct an equitable remedy which involves ratio hiring. In Carter v. Gallagher, supra, the Court states 452 F.2d at 331:

> "It has now been established by the Supreme Court that the use of mathematical ratios as 'a starting point in the process of shaping a remedy' is not unconstitutional and is 'within the equitable remedial discretion of the District Court.' Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L. Ed.2d 554 (1971)."

In spite of extensive legal authorization, this court believes that ratio hiring or quota relief is an unusual and extraordinary remedy and does not automatically follow from the finding of any kind of discrimination. Ratio hiring is appropriate in this case because it appears to be the only possible means to provide relief for racial discrimination.[4]

---

4. The imposition of substantial ratio hiring as provided in paragraph 5 of this opinion and order is particularly justified in this case because of the small number of vacancies in each skilled craft job classification. There are a total of 39 available skilled craft positions with the City of Milwaukee (Stipulation, Exhibit 13, total of temporary appointments and vacancies) and 25 available skilled craft positions with the Board of School Directors

For the foregoing reasons, it is the order, judgment and decree of this court that:

1. The defendants and their successors in office continue and also improve their efforts to actively recruit blacks and other minorities for all their "skilled crafts" positions.

2. The defendants and their successors in office continue and also improve their "skilled crafts" job information dissemination efforts in the black and other minority communities so that blacks and other minorities will know when jobs become available in defendants' "skilled crafts" positions.

3. The defendants and their successors in office continue to validate all "skilled crafts" job selection devices in accordance with the E.E.O.C. Guidelines contained in 29 C.F.R. § 1607.1 et seq., or as they may be amended.

4. The defendants and their successors in office are specifically enjoined from utilizing apprenticeship and experience requirements as prejob selection devices in the "prevailing wage" skilled crafts positions until such time as defendants can demonstrate that such prejob screening devices no longer have a disproportionate adverse racial impact or that no viable or properly validated substitute means of measuring requisite skills necessary for job performance can be developed.

5. Pending further order of this court or until the proportion of blacks in each "skilled craft" job classification, as found in Exhibits 7a, 7b, and 8 of the stipulation of uncontested facts (attached hereto as Exhibits 1(a), 1(b), and 2) equals the proportion of blacks in the population of the City of Milwaukee, defendants and their successors in office

shall appoint blacks off the Civil Service eligible lists for vacancies which occur in the City of Milwaukee and Board of School Directors' skilled craft job classifications as follows:

A. For every two vacancies which occur in a "skilled crafts" job classification, one qualified black person shall be appointed until such time as the percentage of blacks in that specific job classification equals the percentage of blacks in the City of Milwaukee. Thereafter no ratio hiring procedure need be employed in that job classification.

B. If there is only one vacancy in a "skilled crafts" job classification and blacks are not represented in that classification in a percentage equal to their percentage in the City of Milwaukee, then that vacancy shall go to a qualified black. The next vacancy in that job classification may go to a qualified nonblack person.

C. For purpose of ratio hiring, reinstatement of individuals from layoff and leave of absence to other City jobs or returning from military leaves of absence as provided in Rule X of the Milwaukee Civil Service rules shall be treated as appointment and hiring of such persons under the ratio hiring procedure.

D. For the purpose of ratio hiring, each listed job classification for the "skilled crafts" jobs of the City of Milwaukee, as found in Exhibits 7a and 7b of the stipulation of uncontested facts (Exhibits 1(a) and 1(b) attached), shall be considered as a separate job classification; and each listed job classification for the "skilled crafts" positions of the Milwaukee Public Schools as found in Exhibit 8 of the stipulation of uncontested facts (Exhibit 2 attached) shall be considered as a separate job classifica-

(Stipulation, Exhibit 8). As 17.2% of the population of Milwaukee is black, 213 blacks instead of 38 should be skilled craft employees (1,239 positions × 17.2%). Thus, there is a deficiency of 175 blacks in the skilled craft positions. In order to add 175 black skilled craft employees within a reasonable number of years, the one-to-one hiring ratio contained in the order is required. Assuming that the number of vacancies remains constant at 60 vacancies per year (64 vacancies presently

exist), it will still take approximately six years to accomplish the hiring goal of 175 blacks under a one-to-one ratio hiring procedure. At this stage in the litigation, the Court believes that the one-for-three ratio proposed by the City is inadequate. Defendants' one-for-three ratio would extend the remedy period to approximately twelve years, assuming the same number of vacancies per year.

tion, except that all "skilled crafts" classifications in which less than five positions exist will, for the purposes of this order, be considered as one job classification.[5]

E. The above-described ratio hiring procedure shall be operative for appointments to all vacancies occurring in the "skilled crafts" job classification except as specifically provided for in the following instances:

(1) Emergency appointments limited to 10 days' duration as provided for in Rule IX, Section 4, of the Milwaukee Civil Service rules.

(2) Temporary appointments limited to 60 days' duration as provided in Rule IX, Section 2, of the Milwaukee Civil Service rules.

(3) Provisional appointments limited to 180 days' duration as provided for in Rule IX, Section 1, of the Milwaukee Civil Service rules.

(4) Temporary and provisional appointments as identified in subparagraphs E(2) and (3), respectively, shall be limited to one such appointment per person and may not be renewed.

F. The defendants and their successors in office may be relieved of the necessity of employing the above-described ratio hiring procedure in a specific job classification only upon agreement of counsel for all parties and by order of the court, or by order of the court if counsel cannot agree. At least thirty days prior to making application to the court for relief, the movant shall give notice to opposing counsel of his intention to seek relief and a summary of the grounds for such relief, and shall meet with opposing counsel in an attempt to reach an agreement. The court will grant such relief only where just and proper and upon a showing of good cause.

6. For the purposes of ratio hiring, the defendants, where appropriate, shall establish, if needed, both black and non-black Civil Service eligible lists in order to comply with the above ratio hiring procedure.

7. Nothing in this order shall require or be construed to require defendants to discharge or lay off any employees, to hire nonqualified employees, or to hire more employees than are needed to perform the work available.

8. If any situation relative to hiring in the "skilled crafts" positions of the defendants shall arise which is not covered by the express or implied terms of this order, then any of the parties to this action may apply to the court, upon notice, for clarification of that situation in conformity with the provisions of this order.

9. The court shall retain jurisdiction of this action for such supplemental relief or corrective relief as may be necessary or appropriate.

10. The named plaintiff, Edward C. Crockett, shall be given the performance examination for the position of bricklayer with observers, upon whom the parties can mutually agree, present. If plaintiff Crockett successfully completes said examination, defendants shall certify only Crockett as eligible to fill the Board of School Directors' vacancy for a bricklayer, for which vacancy Crockett had applied in September of 1973.

11. The parties have agreed that the Milwaukee Board of City Service Commissioners shall be responsible for administering the provisions of this order.

5. It is necessary to consider skilled craft job classifications in which four or less positions exist as a single job classification for purposes of the ratio hiring procedure described in paragraphs 5–A and B of this order. The objective to be achieved by the ratio hiring is proportional representation of blacks in the skilled craft positions. Thus, the ratio hiring procedure is used to raise the percentage of blacks employed in the skilled craft job classifications to equal the percentage of blacks in the general population of the City of Milwaukee—17.2%. In those job classifications in which less than five positions exist, appointment of one black would raise the percentage of blacks in that job classification to a percentage greater than the percentage of blacks in the City of Milwaukee. This problem is obviated by considering job classifications with less than five positions as a single job classification and applying the ratio procedure to a greater number of positions.

EXHIBIT 1(a)

City Service Commission
December 28, 1973

## MINORITY COMPOSITION OF CITY OF MILWAUKEE POSITIONS CLASSIFIED AS SKILLED CRAFT POSITIONS ON THE EEOC–4 REPORT FORM, AUGUST 24, 1973.[1]

NUMBER OF EMPLOYEES

| CLASS CODE NO. | POSITION TITLE | TOTAL | MINORITY | BLACK | VACANCIES AS OF 1/2/74 |
|---|---|---|---|---|---|
| 218 | Sewer Yardman | 1 | 0 | 0 | |
| 637 | Maintenance Mechanic Foreman | 1 | 0 | 0 | |
| 800 | Audio. Visual Mechanic | 1 | 0 | 0 | |
| 802 | Auto. Maintenance Mechanic | 9 | 0 | 0 | |
| 806 | Automotive Mechanic | 58 | 1 | 1 | |
| 807 | Automotive Electrician | 2 | 0 | 0 | |
| 812 | Blacksmith | 1 | 0 | 0 | |
| 813 | Body Repairman | 4 | 0 | 0 | |
| 818 | Casemaker | – | – | – | |
| 819 | Elec. Services Blacksmith | 1 | 0 | 0 | |
| 821 | Field Serviceman | 5 | 0 | 0 | |
| 822 | Filtration Plant Mechanic | 4 | 0 | 0 | |
| 831 | Harbor Maintenance Mechanic | 1 | 0 | 0 | |
| 832 | Machine Shop Foreman | – | – | – | |
| 833 | Machinist | 14 | 0 | 0 | |
| 834 | Asphalt Plant Mechanic | 1 | 0 | 0 | |
| 835 | Library Mechanic | 2 | 0 | 0 | |
| 836 | Maintenance Mechanic | 22 | 4 | 4 | |
| 837 | Maintenance Millwright | 1 | 0 | 0 | |
| 838 | Water Maintenance Mechanic | 9 | 0 | 0 | 1 |
| 846 | Meter Repairman II | 9 | 0 | 0 | |
| 847 | Meter Repairman III | 3 | 0 | 0 | |
| 849 | Heating and Vent. Mech. I | 8 | 0 | 0 | |
| 850 | Heating and Vent. Mech. II | 10 | 0 | 0 | 1 |
| 852 | Parking Meter Repairman II | 2 | 0 | 0 | |
| 853 | Parking Meter Repairman III | 1 | 0 | 0 | |
| 854 | Power Plant Steamfitter | 1 | 0 | 0 | |
| 855 | Power Plant Blacksmith | 1 | 0 | 0 | |
| 856 | Power Plant Boiler Repairman | 2 | 0 | 0 | |
| 872 | Water Department Blacksmith | 1 | 0 | 0 | |
| 901 | Asphalt Plant Helper and Oper. | 2 | 0 | 0 | |
| 912 | Bookbinder | 2 | 0 | 0 | |
| 915 | Booster Station Operator I | 2 | 0 | 0 | |
| 916 | Booster Station Operator II | 2 | 0 | 0 | |

1. This list does not include the following Fire Department positions which were not included in the Affirmative Action Program Data Status Report #1: Fire Equipment Mechanic I and II; Fire Equipment Repairman II; and Marine Engineer.

| CLASS CODE NO. | POSITION TITLE | NUMBER OF EMPLOYEES | | | VACANCIES AS OF 1/2/74 |
|---|---|---|---|---|---|
| | | TOTAL | MINORITY | BLACK | |
| 933 | Fireman, Major Station | 1 | 0 | 0 | |
| 957 | Operating Engineer I | 12 | 0 | 0 | |
| 960 | Operating Eng. and Machinist I | 3 | 0 | 0 | |
| 969 | Printer | 2 | 0 | 0 | |
| 1003 | Arborist I | 93 | 6 | 5 | 1 |
| 1004 | Arborist II | 13 | 1 | 1 | 2 |
| 1005 | Arborist III | 4 | 1 | 0 | |
| 1010 | Caulker I | 8 | 0 | 0 | 1 |
| 1011 | Caulker II | 7 | 0 | 0 | |
| 1108 | Assistant Auto. Mech. Foreman | 6 | 0 | 0 | |
| 1109 | Auto. Mech. Foreman | 6 | 0 | 0 | |
| 1115 | Building Main. Foreman I | 2 | 0 | 0 | |
| 1116 | Building Main. Foreman II | 1 | 0 | 0 | |

(Exhibit 7a of Stipulation of Uncontested Facts)

EXHIBIT 1(b)

| CLASS CODE NO. | POSITION TITLE | NUMBER OF EMPLOYEES | | | VACANCIES AS OF 1/2/74 |
|---|---|---|---|---|---|
| | | TOTAL | MINORITY | BLACK | |
| 1130 | Maintenance Mechanic Foreman | — | — | — | |
| 1136 | Assistant Meter Repair Fore. | 1 | 0 | 0 | 1 |
| 11395 | Meter Repair Foreman | — | — | — | |
| 1140 | Radio Mechanic Foreman | — | — | — | |
| 1141 | Sewer Equip. Serviceman & Fore. | 1 | 0 | 0 | |
| 1205 | Assistant Bookbinder Foreman | 1 | 0 | 0 | |
| 1206 | Bookbinder Foreman | 1 | 0 | 0 | |
| 1212 | Eng. in Charge, Minor Station | — | — | — | |
| 1230 | Operating Engineer II | 5 | 0 | 0 | |
| 1233 | Oper. Eng. and Machinist II | 4 | 0 | 0 | |
| 1239 | Linwood Filtr. Oper. in Charge | 3 | 0 | 0 | |
| 1242 | Water Filtr. Oper. in Charge | 5 | 0 | 0 | |
| 1337 | Sewer Examiner Foreman | 1 | 1 | 1 | |
| 1341 | Sewer Foreman III | 6 | 1 | 1 | |
| 1381 | Street Services Foreman I | 5 | 1 | 1 | |
| 1382 | Street Services Foreman II | 10 | 0 | 0 | |
| 1506 | Asphalt Ironer | 1 | 1 | 1 | |

NUMBER OF EMPLOYEES

| CLASS CODE NO. | POSITION TITLE | TOTAL | MINORITY | BLACK | VACANCIES AS OF 1/2/74 |
|---|---|---|---|---|---|
| 1509 | Asphalt Raker | 1 | 1 | 1 | |
| 1512 | Bricklayer, Buildings | 3 | 0 | 0 | |
| 1515 | Carpenter | 21 | 0 | 0 | |
| 1518 | Cement Finisher | 9 | 2 | 1 | 1 |
| 1521 | Clamshell Operator | – | – | – | |
| 1524 | Crane Operator | 4 | 0 | 0 | |
| 1527 | Electrical Mechanic | 107 | 1 | 0 | |
| 1530 | Electrical Mechanic Helper | 31 | 0 | 0 | |
| 1532 | Electrical Mechanic Trainee | 5 | 0 | 0 | |
| 1533 | Electrical Worker | 8 | 1 | 1 | |
| 1534 | Electrical Worker Trainee | 21 | 0 | 0 | |
| 1536 | Engineman, Asphalt Plant | 1 | 0 | 0 | |
| 1539 | Firebrick Mason | 1 | 0 | 0 | |
| 1541 | Grad All Operator | – | – | – | |
| 1545 | Ironworker | 5 | 0 | 0 | |
| 1551 | Painter | 21 | 0 | 0 | |
| 1552 | Painter Chargeman, House | 1 | 0 | 0 | |
| 1554 | Painter, Bridge and Iron | 7 | 0 | 0 | |
| 1555 | Painter Chargeman, Bridge & Iron | – | – | – | |
| 1563 | Sewer Mason | 6 | 0 | 0 | |
| 1603 | Carpenter Foreman | 4 | 0 | 0 | |
| 1606 | Ironworker Foreman | 1 | 0 | 0 | |
| 1609 | Painter Foreman, House | 1 | 0 | 0 | |
| 1612 | Painter Foreman, Ironwork | 1 | 0 | 0 | |
| *{ 2501 | Air Cond. & Water Ser. Insp. | – | – | – | }* |
| 2503 | Boiler Inspector | 3 | 0 | 0 | |
| 2509 | Building Constr. Insp. | 33 | 1 | 1 | |
| 2546 | Inspector, Docks and Dredging | – | – | – | |
| | Plumbing Inspector | 18 | 0 | 0 | |
| TOTAL | | 696 | 23 | 19 | 8 |

*Note by Court: Upon stipulation of the parties and order of the court of July 11, 1974, the last five positions bracketed above are not covered by this order.

(Exhibit 7b of Stipulation of Uncontested Facts)

EXHIBIT 2

| SKILLED CRAFTSMEN<br><br>Milwaukee Public Schools | Positions | Vacancies | White | Black | Spanish Surnamed | Amer. Indian | Asian Amer. | Other |
|---|---|---|---|---|---|---|---|---|
| School Fireman | 138 | 6 | 124 | 13 | 0 | 1 | 0 | 0 |
| School Engineer I | 113 [1] | 3 | 110 | 2 | 0 | 1 | 0 | 0 |
| School Engineer II | 40 | 2 | 38 | 1 | 0 | 0 | 0 | 1 |
| School Engineer III | 34 | 2 | 33 | 1 | 0 | 0 | 0 | 0 |
| Subdispatcher—Site Crew Chargeman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Small Engine Mechanic | 4 | 1 | 3 [2] | 0 | 0 | 0 | 0 | 0 |
| Shade Shop Mechanic | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 |
| Automotive Mechanic | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 |
| Piano Tuner | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Office Equipment Repairman | 3 | 1 | 2 | 0 | 0 | 0 | 0 | 0 |
| Automotive Mechanic Chargeman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Office Equipment Repairman Chargeman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| **Prevailing Wage Employees** | | | | | | | | |
| Asbestos Worker | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 |
| Blacksmith | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Boilermaker | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Bricklayer | 6 | 1 | 5 | 0 | 0 | 0 | 0 | 0 |
| Cabinetmaker | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 |
| Carpenter | 43 | 3 | 40 | 0 | 0 | 0 | 0 | 0 |
| Electrician | 14 | 0 | 14 | 0 | 0 | 0 | 0 | 0 |
| Locksmith | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 |
| Machine Hand | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Machinery Maintenance Repairman | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 0 |
| Painter | 32 | 2 | 29 | 1 | 0 | 0 | 0 | 0 |
| Plasterer | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 0 |
| Plumber | 13 | 0 | 13 | 0 | 0 | 0 | 0 | 0 |
| Sign Painter | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Sheet Metal Worker | 19 | 1 | 17 | 0 | 1 | 0 | 0 | 0 |
| Steamfitter | 15 | 1 | 14 | 0 | 0 | 0 | 0 | 0 |
| Steamfitter Refrigeration | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Steamfitter Welder | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Asbestos Worker and Inspector | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Carpenter Chargeman | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 |
| Electrical Chargeman | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| Machinery Maintenance Chargeman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Painter Chargeman | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 |
| Plasterer Chargeman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Plumbing Chargeman | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| Sheet Metal Chargeman | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 |

1. This figure includes 18 substitute Engineers that were previously omitted.

2. This is a corrected figure where one black was previously reported as employed in error.

SKILLED CRAFTSMEN

Milwaukee Public Schools—Continued

Prevailing Wage Employees—Continued

| | Positions | Vacancies | White | Black | Spanish Surnamed | Amer. Indian | Asian Amer. | Other |
|---|---|---|---|---|---|---|---|---|
| Steamfitter Chargeman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Carpenter Foreman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Electrical Foreman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Man-In-Charge of Mill | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Machinery Maintenance Foreman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Painter Foreman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Plumbing Foreman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Sheet Metal Foreman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Steamfitter Foreman | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |

(Exhibit 8 of Stipulation of Uncontested Facts)