**Alta CHRAPLIWY et al., Plaintiffs,**

v.

**UNIROYAL, INC., et al., Defendants.**

**Civ. No. 72 S 243.**

United States District Court,
N. D. Indiana,
South Bend Division.

May 31, 1977.

Thomas R. Ewald, Washington, D.C., Thomas R. Fette, St. Joseph, Mich., R. Wyatt Mick, Jr., Mishawaka, Ind., James F. Groves, South Bend, Ind., for plaintiffs.

Don G. Blackmond and Timothy W. Woods, Jones, Obenchain, Johnson, Ford, Pankow & Lewis, South Bend, Ind., Harry N. Turk, Arthur, Dry & Kalish, New York City, Rody P. Biggert and Gerald D. Skoning, Seyfarth, Shaw, Fairweather & Gerald-

son, Chicago, Ill., Harley M. Kastner and Charles R. Armstrong, Akron, Ohio, James J. Olson, Mishawaka, Ind., for defendants.

MEMORANDUM

GRANT, District Judge.

## I—INTRODUCTION

On 28 November 1972, twenty-six named plaintiffs brought this suit under 42 U.S.C. § 2000e, [the "Act"],[1] individually and on behalf of other female employees, against the Uniroyal Corporation and their collective bargaining representative, Local Union No. 65, alleging various discriminatory employment practices on the basis of sex. Jurisdiction is founded upon 42 U.S.C. § 2000e–5(f)(1).

On 4 September 1974, plaintiffs filed a motion for summary judgment on all issues of class liability and a motion for a preliminary injunction. Approximately two years later, Uniroyal filed a cross-motion seeking summary judgment with respect to four specific matters at issue. All motions and supporting briefs have been timely filed with the court.

### 1. *Motions for Summary Judgment*

■ Summary judgment should only be entered when the pleadings, depositions, answers to interrogatories, affidavits, and admissions filed in the case "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Rule 56 F.R.C.P. Under this rule the movant bears the heavy burden of demonstrating the absence of all material factual issues; furthermore, all factual uncertainties shall be resolved in favor of the non-moving party. *Rose v. Bridgeport Brass Co.*, 487 F.2d 804,

808 (7th Cir. 1973); *Albert Dickinson Co. v. Mellos Peanut Co.*, 179 F.2d 265, 268 (7th Cir. 1950). As for cross-motions for summary judgment, *see* 10 Wright & Miller, *Federal Practice & Procedure*, § 2720 p. 459 (1973).

This court, however, does not begin with a clean slate. On 5 July 1973, the late Judge Beamer[2] entered partial summary judgment against Uniroyal on the following matters:

(1) The company has conducted layoffs in the Mishawaka plant on a segregated basis according to sex;

(2) At all times up to and including 1970, defendant company paid new employees at the plant according to discriminatory starting pay rates on the basis of sex, and

(3) Defendant company refuses to consider female employees for assignment, transfer, or promotion to jobs which were restricted to male employees only, regardless of the seniority or qualifications of the female employees. Those jobs are listed in plaintiffs' requests to admit facts filed 2 March 1973.[3]

■ This order was based upon the Company's failure to respond to plaintiffs' requests for admissions in accordance with Rule 36, F.R.C.P. There has been much discussion by the parties concerning the significance of this order. Having considered the respective arguments, the court concludes that Judge Beamer's findings merely establish in plaintiffs' favor a prima facie case of sex discrimination which defendant may seek to now justify. The 5 July 1973 order, therefore, will not be considered dispositive of the above issues unless no viable defense is presented by the Company. *See,*

---

**1.** The Act, or Title VII, was enacted as part of the Civil Rights Act of 1964. The legislative history of this statute may be found at 1964 U.S.Code Congressional and Administrative News, p. 2355, and 1972 U.S.Code Congressional and Administrative News, p. 2137: *cf. Willingham v. Main Telegraph Publishing Co.*, 507 F.2d 1084, 1090–91 (5th Cir. 1975).

**2.** Judge George N. Beamer of this United States District Court died in October, 1974. This case was left pending for some time following his death.

**3.** *See,* 6 FEP Cas. 98 (N.D.Ind.1973). Judge Beamer later refused to set aside this order at 7 FEP Cas. 343 (N.D.Ind.1973).

*Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

This being a motion for summary judgment with respect to the issue of class liability, the court's inquiry must be limited to a comparison between the disparate effects, if any, that a particular employment practice has upon two groups or classes of individuals. The focus during the first stage of this bifurcated class action is "inter-class" as opposed to "intra-class" which, of course, is the proper inquiry during the second, or individual relief stage. The distinction must be clearly drawn at the outset since Uniroyal has, in many instances, raised arguments that would have the court examine the merits of individual claims. *See, Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437, 443–44 (5th Cir. 1974). Before examining plaintiffs' motion for summary judgment, the court shall first examine several preliminary issues raised by Defendant Uniroyal and Defendant Local No. 65.

## II—UNIROYAL'S CROSS–MOTION FOR SUMMARY JUDGMENT

### 1. *Alleged Discriminatory Layoffs*

The Company first seeks a ruling that this court lacks subject matter jurisdiction with respect to claims of discriminatory layoffs occurring more than ninety days prior [4] to the filing of charges with the Equal Employment Opportunity Commission.

Beginning in November 1968, the Company began laying off several hundred employees over a two-year period as the plant's footwear divisions (which employed approximately 42% of the work force at the Mishawaka facility) were being closed and transferred to locations in the East. On 13 January 1970 plaintiffs filed charges with the EEOC specifically complaining that the layoffs were conducted in a discriminatory fashion to the detriment of female employees; therefore, the applicable cut-off date is 15 October 1969 (ninety days prior to the filing of charges with the EEOC).

Generally, Title VII provides that to present a cognizable claim in federal court, an aggrieved party must first file a complaint with the EEOC within ninety days after the alleged unlawful employment practice has occurred. This basic limitation, however, may be extended (or tolled) in those instances where the alleged discriminatory conduct is considered to be a "continuing violation" of the Act. *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971); *Cox v. United States Gypsum Co.*, 409 F.2d 289 (7th Cir. 1969).

Here, Uniroyal contends that individual claims which allege discriminatory layoffs prior to 15 October 1969 should now be dismissed. It is defendant's contention that such layoffs are not "continuing violations" of Title VII.

This is the second time Uniroyal has advanced this argument before the court. On 23 March 1973 Judge Beamer, in an order denying Uniroyal's motion to dismiss and/or strike portions of plaintiffs' complaint, rejected the Company's position:

> Finally, defendant contends that the claims of discriminatory layoffs . . . are not continuing violations and, therefore, only eleven of the plaintiffs have made a timely presentation of this claim to the EEOC. As noted above . . . the court must assume that this is a proper class action and, accordingly, all of the plaintiffs need not have made a timely presentation of this charge. *Oatis v. Crown Fellerback Corp.*, 398 F.2d 496 (5th Cir. 1968); *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711 (7th Cir. 1969). Therefore, we need not reach the question of whether such charges constitute continuing violations.[5]

The court refuses to set aside Judge Beamer's earlier determination. However, the court is unable to agree with plaintiffs that the issue raised by the Company is wholly immaterial to this case. Whether or not the tardy claims are barred by the statutory limitation is a question which the

---

4. This period was later enlarged to 180 days by the 1972 Amendments to Title VII; *see* 42 U.S.C. § 2000e–5(e) (1972).

5. Court Order of 23 March 1973 at 6.

March 23rd order, and cases cited therein, did not reach. Consequently, the court must reserve judgment on this matter until the individual relief stage of this case when it shall be appropriate for the court to conduct an "intra-class" examination of individual claims.

### 2. *Duty of Affirmative Action*

Uniroyal next asks for a ruling that it did not violate Title VII with respect to plaintiffs' allegations that subsequent to November 1971 the Company failed to adopt a credible policy of equal employment opportunity.

■ The Company maintains that an employer has no obligation under the Civil Rights Act of 1964 to fashion and implement an affirmative action program unless so ordered by a judicial decree. Defendant's claim has no merit. *See, Local 189, United Papermakers & Paperworkers, A.F. L.-C.I.O., C.L.C. v. United States*, 416 F.2d 980, 987–91 (5th Cir. 1969); *Myers v. Gilmore Paper Co.*, 392 F.Supp. 413, 420 (S.D. Ga.1975); *Stevenson v. International Paper Co.*, 352 F.Supp. 230 (S.D.Ala.1972); *United States v. Central Motor Lines, Inc.*, 338 F.Supp. 532 (W.D.N.C.1971); *United States v. Virginia Electric & Power Co.*, 327 F.Supp. 1034 (E.D.Va.1971); and *Irvin v. Mohawk Rubber Co.*, 308 F.Supp. 152 (E.D. Ark.1970). The more difficult question now facing the court is whether Uniroyal breached its duty of affirmative action. As a practical matter, that issue cannot be determined until the full extent of Uniroyal's discriminatory practices before November 1971, if any, is established. The matter shall be examined with respect to plaintiffs' motion for summary judgment.

### III—UNION'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Apart from alleging the existence of factual issues requiring trial, the Union has set forth various reasons why plaintiffs, as a matter of law, cannot succeed in their effort. Plaintiffs' motion states that:

Contrary to its duty the defendant Local No. 65, United Rubber Workers, in its agreements with Uniroyal has discriminated against the female members of its collective bargaining unit, including all of the dues-paying female members of the Local, by negotiating pay rates for the Mishawaka plant which discriminate against female workers as a class and by agreeing to discriminatory bidding, bumping, and disqualification rules that perpetuate segregation and discrimination against the female employees it has the duty to represent. The defendant union has acquiesced while Uniroyal has maintained a segregated system of employment that has discriminated against the female members of its collective bargaining unit as a class with respect to job assignments, promotions, transfers, layoffs, recalls, and terminations.

■ The Union's first defense is that any and all discriminatory employment practices were solely the result of Uniroyal's policies and procedures. Without citing any authority, the Union submits that acquiescence by a union to an employer's unlawful employment practices is a valid defense in a Title VII action. However, all authorities located by the court have reached the opposite conclusion. For example, in *Myers v. Gilman Paper Co., supra*, the court's memorandum reads as follows:

In general, the defendant Unions argue that they took no part in any discriminatory practices prior to or after 1965, and that Gilman Paper Corporation was solely responsible for all racial discrimination in employment, assignments, promotions, and transfers . . .

Assuming, without finding, that Gilman was *solely* responsible for all racial discrimination in employment, assignments, promotions, and transfers prior to and after 1965, that fact raises no defense for the Unions. The essence of the plaintiffs' claim against the Unions is that the collective bargaining agreements tended to perpetuate and, in fact, perpetuated past discrimination, thus constituting present discrimination.

Recent decisions by the Court of Appeals for the Fifth Circuit leave this Court with the clear understanding that Title VII, as construed in this circuit, places an affirmative duty on labor unions, as well as employers, to take corrective steps to prevent present discriminatory practices, to remove impediments that perpetuate past discrimination, and to place discriminatees into their "rightful place". (Citations omitted.)

*Id.* at 419–420; *see also, Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant,* 491 F.2d 1364, 1381–82 (5th Cir. 1974); and *Machlin v. Spector Freight Systems, Inc.,* 156 U.S.App.D.C. 69 at 79, 478 F.2d 979 at 989 (1973). Furthermore, the Union's implication that it acted at all times in good faith is inconsequential under the Act. *Griggs v. Duke Power Co., supra,* 401 U.S. at 432, 91 S.Ct. 849.

■ The Union next challenges on three grounds the plaintiffs' allegation that the Local failed to represent its membership in a fair manner as mandated by the National Labor Relations Act, 29 U.S.C. § 158 (1970). *See Steele v. Louisville & N. L. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). Relying upon *Miranda Fuel Co.,* 140 N.L. R.B. 181, 51 L.R.R.M. 1584 (1962) and *Local Union No. 12 United Rubber Workers v. N.L.R.B.,* 368 F.2d 12 (5th Cir. 1966), the Local first argues that plaintiffs' claim should be presented before the National Labor Relations Board rather than this court. In other words, the Union maintains that the Board's jurisdiction pre-empts this court of the authority needed to entertain the instant matter.

However, after *Miranda Fuel* and *Local Union No. 12* were decided, the Supreme Court, in *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), had this to say about the pre-emption doctrine:

A primary justification for the pre-emption doctrine—the need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose—is not applicable to cases involving alleged breaches of the union's duty of fair representation. The doctrine was judicially developed in *Steele* and its progeny, and suits alleging breach of duty remained judicially cognizable long after the NLRB was given unfair labor practice jurisdiction over union activities by the L.M.R.A. Moreover, when the Board declared in *Miranda Fuel* that a union's breach of its duty of fair representation would henceforth be treated as an unfair labor practice, the Board adopted and applied the doctrine as it had been developed by the federal courts.

Thus, the court has the power to adjudicate the § 158 claim.

■ The Union further argues, without supporting authority, that the representational duty is in some way limited to unions which have historically refused membership to black individuals. The court is unable to discern any such limitation. While many of the reported cases have involved racially segregated unions, the *Steele* decision makes clear that the statutory duty extends to all labor organizations defined by N.L. R.A., and is designed to eliminate all irrelevant and invidious classification schemes, including discrimination on the basis of sex. *Cf. Adkinson v. Owens-Illinois Glass Co., Inc.,* 10 FEP Cas. 710 (N.D.Ga.1975); and *Glus v. Murphy Co.,* 329 F.Supp. 563 (W.D. Pa.1971).

■ Lastly, the Union contends that plaintiffs' claim must fail since plaintiffs did not exhaust their intra-union remedies before commencing this suit. As a general rule, an aggrieved party must first resort to such remedies before his claim may be adjudicated in federal court. The purpose of this rule is well stated in *Ruficka v. General Motors Corp.,* 523 F.2d 306, 311 (6th Cir. 1975):

The reason for this requirement is that intra-union remedies are part and parcel of the industrial in-house procedure for settling labor disputes. The primary benefit of requiring initial submission of employee complaints against a union . . . is that the internal machinery can settle difficulties short of court action.

■ It is quite apparent in this case that to find in defendant's favor would not effectuate the purpose of the exhaustion requirement. The conciliatory mechanisms of Title VII have failed to produce amiable results. To now separate the N.L.R.A. claim and return the plaintiffs to their union remedies in hope of reaching an accord would certainly be a fruitless endeavor. Therefore, the court shall now consider the instant claim, together with those arising under Title VII. *See, Jones v. Trans-World Airlines, Inc.,* 495 F.2d 790 (2d Cir. 1974).

## IV—PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### 1. *Pre-Act Employment Practices*

Plaintiffs begin their motion and brief arguing that prior to the effective date of Title VII, 2 July 1965, Uniroyal openly segregated job opportunities according to an individual's sex. Specifically, plaintiffs maintain that Uniroyal (1) classified each job within the plant as a "male" or "female" job; (2) operated a segregated personnel office on the basis of sex; (3) paid male employees a higher wage rate than female employees, and (4) kept seniority lists for each department within the plant on a segregated basis according to sex.

■ It is today well settled that the provisions of Title VII are not retroactive in effect; discriminatory employment practices happening prior to 2 July 1965 and ending thereafter will not, when standing alone, give rise to a cause of action. *See, e. g., James v. Stockham Valves & Fittings Co.,* 394 F.Supp. 434, 493 (D.Ala.1975). However, Title VII places an affirmative duty upon an employer to rectify the current effects of wrongful discrimination which existed before passage of the Act. *See, e. g., Myers v. Gilmore Paper Co., supra,* at 420. Subsequent to 2 July 1965, then, failure on the part of an employer to voluntarily remove the discriminatory effects of its pre-Act employment practices will constitute an encroachment of Title VII, provided the aggrieved party can establish a causal nexus between past discrimination and present conditions of em-

ployment. *James v. Stockham Valves & Fittings Co., supra,* at 493. For this reason, the Company's employment practices and policies in effect before 1965 are relevant to this case.

■ When discrimination in employment practices and conditions is alleged, the plaintiff must first establish a prima facie case by showing disparate treatment between two classes of individuals. Generally, statistical evidence is used to accomplish this task. *Ibid.* at 492. Assuming the plaintiff meets this challenge, the burden then shifts to the defendant to justify its actions. Unintentional discriminatory practices as well as discrimination founded upon a compelling "business purpose" are viable defenses under the Act. *See, Kober v. Westinghouse Electric Corp.,* 480 F.2d 240 (3d Cir. 1973); and *Griggs v. Duke Power Co., supra,* 401 U.S. at 432, 91 S.Ct. 849, respectively.

In the present case, Uniroyal does not dispute plaintiffs' allegations of discriminatory conduct described above; it does, however, seek to justify the "male"-"female" job classification scheme. According to the Company, the scheme resulted from the personal preferences of female employees to perform the less physically demanding "female" jobs as opposed to the more strenuous tasks of a "male" job. Defendant has submitted several affidavits of employees which state, in essence, that no female worker ever expressed a willingness to hold a traditionally designated male position. The Company, therefore, concludes that the "concentration" of female workers in certain departments within the plant was the result of factors other than Uniroyal's employment practices and policies.

■ The question which immediately arises is whether an employer, whose female employees prefer to hold the lower paying and less strenuous positions, is in violation of federal law. The obvious answer to this question is no, provided all qualified employees possess the unfettered right to seek any job available within the plant. That situation did not exist at Uni-

royal prior to 1965. The record clearly shows that defendant deliberately constructed a system of classifying jobs in which the determinative factor was an individual's sex and not his or her abilities. Although ostensibly based upon good faith, Uniroyal's presumption that *all* female workers could perform *none* of the male jobs because of their supposed physical limitations is precisely the evil Congress had in mind when it enacted Title VII. *See, e. g., Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1972); *Willingham v. Macon Telegraph Publishing Co.,* 507 F.2d 1084 (5th Cir. 1975); and *Sporgis v. United Air Lines,* 444 F.2d 1194 (7th Cir. 1971).

 Uniroyal's conduct is clearly outside the purview of 42 U.S.C. § 2000e–2(e) which provides an exception to the general prohibitions of Title VII when "sex . . . is a bona fide occupational qualification" [BFOQ]. Recently, the same defense came before the Ninth Circuit Court of Appeals in *Rosenfeld v. Southern Pacific Co.,* 444 F.2d 1219 (9th Cir. 1971). In that case the court rejected defendant's BFOQ argument, stating at pages 1224–25:

> . . . on the basis of a general assumption regarding the physical capabilities of female employees, the company attempts to raise a commonly accepted characterization of women as the "weaker sex" to the level of a BFOQ . . . Based on the legislative intent and on the Commission's interpretation, sexual characteristics, rather than characteristics that might, to one degree or another, correlate with a particular sex, must be the basis for the application of the BFOQ exception. *See* Developments in the Law—Title VII, 84 Harv.L.Rev. 1109, 1178–1179 (1971). Southern Pacific has not, and could not allege such a basis here, and section 703(e) thus could not exempt its policy from the impact of Title VII. There was no error in the granting of summary judgment on this issue.

There being no indication in the present case that the sexual characteristics of an employee are crucial to the successful performance of a "male" job (as would be the case, for example, with the need for an actor or actress) the court must similarly reject defendant's contention. See, 29 C.F.R. § 1604.1(a). The Company's position is strengthened neither by the allegation that it did not intentionally discriminate on the basis of sex, *Griggs v. Duke Power Co., supra,* 401 U.S. at 432, 91 S.Ct. 849, nor the fact that no female employee ever challenged the system by trying to obtain a male job. *See Sagers v. Yellow Freight System, Inc.,* 388 F.Supp. 507, 515 (N.D.Ga. 1973); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 4 FEP Cas. 325, 329 (Pa.Cmwlth.1972). *Rodriguez v. East Texas Motor Freight Co.,* 505 F.2d 40, 58 (5th Cir. 1974); *Ostapowicz v. Johnson Bronze Co.,* 369 F.Supp. 522 (W.D.Pa.1973).

Defendant has not challenged the remaining allegations of discriminatory conduct. Consequently, the court finds that prior to 2 July 1965, Uniroyal segregated jobs at the Mishawaka facility on the basis of sex; maintained a segregated personnel office on the basis of sex; kept segregated seniority lists according to sex; and paid male employees a higher wage rate than female employees. As stated above, however, such findings do not constitute violations of Title VII unless plaintiffs establish a nexus between the discriminatory practices just described and post July 1965 employment conditions. To that matter the court now turns.

## 2. *1965–1970*

Although the Civil Rights Act of 1964 became effective July 2nd of that year, the provisions of Title VII did not take effect until 2 July 1965. The enforcement delay was permitted so that employers would have sufficient time in which to familiarize themselves with the new legislation as well as to remove from their employment systems all unjustified forms of segregation. In this case, plaintiffs claim that from the effective date of Title VII until the end of 1970, Uniroyal maintained the same segregated employment system which existed before passage of the Act. In their brief,

plaintiffs have enumerated eight specific instances in which Uniroyal allegedly continued to discriminate against the class of female employees throughout the first five years of Title VII. Each allegation will be examined *seriatim.*

### A—*The Alleged Segregated "A–B" System*

■ The first issue before the court is whether the Company abolished the segregated "male-female" job classification system following the enactment of Title VII. Having considered the evidence, the court finds that Uniroyal's action had the effect of merely disguising the former discriminatory system. The only change discernable to the court is one of form; the traditionally designated "male" jobs were reclassified as "Class A" jobs, and the traditional "female" positions were reclassified as "Class B" jobs. Of significance is the fact that Uniroyal also began categorizing all employees on the basis of sex. All male workers were known as "A" workers and assigned to Class A jobs, and all female workers were known as "B" workers and assigned to Class B jobs.

Unsurprisingly, the statistical evidence overwhelmingly indicates that the new "A-B" system operated to restrict an employee's job opportunities to the same extent as before the enactment of Title VII.[6] Such evidence establishes for plaintiffs a prima facie case which defendant has not attempted to justify other than to say that the system was not intentionally designed with discriminatory consequences in mind, and that no female employee outwardly expressed a desire to hold a Class A job. However, as we have indicated before, such arguments do not present tenable defenses in a Title VII suit. See p. 11, *infra.* Plaintiffs are therefore entitled to a decree that

Uniroyal's dual system of designating both employees and jobs within the plant was discriminatory on the basis of sex.

### B—*Alleged Discriminatory Practices Regarding Job Bidding, Bumping and Promotion*

■ Plaintiffs next seek a judgment that Uniroyal maintained unlawful bidding, bumping and promotion rules from 1965 through 1970. It appears that very little actually changed at the Mishawaka facility after Title VII went into effect. Under the Company's "A-B" system, no female employee ever held a traditionally designated "male" job during this period of time.[7]

### Bidding Rules

The terms of the labor agreement then in force (1965–1970), provided that qualified employees were permitted to bid on jobs located anywhere in the plant; the agreement contained no reference to an individual's sex. Although seemingly innocuous, in operation this proviso presented an obstacle to female employees wishing to enter the Class A job market.[8]

When a particular job became available in his department, a plant foreman was required to categorize each vacancy as a Class A or Class B job. Employees desiring to bid on the job would have to act according to those designations since "A" jobs were filled by Mr. Edgar Kavanaugh, Supervisor of Male Employment, and the "B" jobs were filled by Mrs. Elizabeth Hoffer, Supervisor of Female Employment. See Part IV, 2–E. Thus, if a female worker wanted to bid on an "A" job, she would have to obtain that job through an office which has traditionally placed male workers in the plant and which, by its very name, gave the appearance of continued preferen-

---

**6.** The evidence shows that no female employee held a traditionally designated "male" job until 1971. However, in March 1966, the Company did reclassify four "female" jobs as Class A positions. Thus, some females did hold Class A jobs. But the fact remains that from 1965 to 1970, females held essentially the same jobs as they did prior to the Act.

**7.** *Ibid.*

**8.** Under Title VII, neutral employment practices and policies which operate to "freeze" the status quo of prior discriminatory conduct cannot be maintained by an employer. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *United States v. Bethlehem Steel Corp.,* 446 F.2d 652 (2d Cir. 1971).

tial treatment. Female workers, therefore, would have to challenge Uniroyal's employment system in order to successfully bid on jobs historically held by men. The rules posed an uncertain risk to females, which members of the opposite sex—solely because of their sex—did not have to encounter. The graph below shows the discriminatory impact that the bidding rules had in the plant.

JOB BIDDING
1968–1970

| Jobs Posted | Total Bids | Bids by Male Employees | Bids by Female Employees |
|---|---|---|---|
| "Class A" | 1,869 | 1,868 | 1 |
| "Class B" | 1,197 | 2 | 1,195 |

*Bumping Rules*

From 1965 through 1968,[9] the labor agreements at Uniroyal also provided that each employee affected by the shutdown of a product line or division had the option, regardless of sex, of (1) bumping a less senior employee on a job which the affected worker could perform within a reasonably short training period; (2) bumping a less senior employee on a job in which the former employee had previous experience; or (3) by accepting an "open" job located anywhere in the plant. When considered in isolation, the contractual bumping rules appear to be consonant with the demands of Title VII. However, when set against the discriminatory "A-B" system, the provisions also had the effect of restricting job opportunities on the basis of sex.

Before 1971, an incumbent employee seeking to bump into a Class A job did so by going through Mr. Kavanaugh's office. If, on the other hand, a worker wanted to bump into a Class B job, the request was

**9.** In 1968 the Company changed its rules with respect to bumping. The validity of those rules are examined in Part IV, G, *infra.*

**10.** Uniroyal's efforts to raise a material issue of fact based upon statements contained in the affidavits of Mr. Kavanaugh and Ellen A. Seltzer, a female worker, must fail. Kavanaugh's conclusory statement that the "A-B" system was nondiscriminatory is clearly insufficient when evidence establishing a prima face case is

channeled through Mrs. Hoffer's office. By its very nature, this system of filling different jobs and job opportunities through different offices labeled "male" and "female" is presumptively invalid. *Cypress v. Newport News,* 375 F.2d 648 (4th Cir. 1967). Once again, in order to move into a higher paying Class A job, a female worker would have to break precedent and challenge the traditional employment practices of Uniroyal. Male employees, on the other hand, did not have to undertake such a task (at least with respect to the "A" jobs). It is not surprising then, that no female employee successfully bumped into a Class A job until Frances Klaer did so in 1971.

For these reasons, the same result must also obtain in connection with Uniroyal's practice of promoting employees within the plant. Consequently, the court finds as a matter of law, that Uniroyal maintained discriminatory bidding and promotion rules from 1965 until and including 1970, and discriminatory bumping rules from 1965 to 1968, in violation of the Act's prohibition against sex discrimination.[10]

*C—Alleged Exclusion of Female Employees from Most of the Departments and Jobs in the Plant*

It is plaintiffs' contention that following the enactment of Title VII, Uniroyal continued to exclude female employees from most of the departments in the plant. In June 1970, for example, defendant operated 89 departments of which 61 were restricted to male employees. Four departments were restricted to females; the remaining 24 departments contained both Class A and Class B jobs. The graph below portrays a prima facie case of discrimination.

presented before the court. *See, Jones v. Lee Way Motor Freight, Inc.,* 431 F.2d 245, 247 (10th Cir. 1970) and cases therein cited. Seltzer's contention that she was never discriminated against by the Company is irrelevant to the issue of class liability. Whether or not individual members of the plaintiff class were wrongfully denied equal employment opportunities is a matter properly raised during Stage II.

JUNE 1970

Department Employment Statistics by Sex

| Departments— | 61 Male | 4 Female | 24 Male & Female |
|---|---|---|---|
| Male Employees— | 782 | - 0 - | 268 |
| Female Employees— | - 0 - | 25 | 370 |
| Total Employees— | 782 | 25 | 638 |

Plaintiffs further maintain that defendant excluded female employees from most of the jobs in the plant. In 1969, for instance, the Company designated 1,251 jobs as "A" jobs and only 460 jobs as "B" jobs. Thus, female workers were restricted to one-fourth of the available jobs. Having advanced no justification for this statistical disparity (other than those resolved earlier in plaintiffs' favor), the court finds that due to discriminatory employment practices described above, Uniroyal wrongfully restricted female employees to particular departments and jobs solely on the basis of sex.

### D—Allegations that Uniroyal Paid Female Employees Less than Male Employees

Plaintiffs next seek a determination that Uniroyal paid female workers with Class B jobs a lower wage rate than male workers with Class A jobs, and that the reason for this differentiation was based solely upon sex. Evidence submitted by the plaintiffs for the year 1969, for example, clearly shows that in eight of Uniroyal's 14 plant divisions, the lowest paid male workers holding an "A" job received a higher wage rate than the highest paid female worker with a "B" job. Thus, in many instances, male employees, including new male employees, were paid a higher wage rate than their female counterparts.

Section 2000e–2(h) of the Act provides in pertinent part:

It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.

Section 206(d), or the Equal Pay Act, forbids wage discrimination "between employees on the basis of sex" when employees perform "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Under this section, the court's initial inquiry is always: Are the jobs held by a male and a female substantially equal? *Walker v. Columbia University,* 407 F.Supp. 1370, 1374 (S.D.N.Y.1976); *Shultz v. Kimberly-Clark Corp.,* 315 F.Supp. 1323, 1326 (W.D.Tenn. 1970). The statute requires an aggrieved party to demonstrate to the court that all factors other than sex are constant, such that the only variable which can possibly explain the wage differential is sex.

In this case, plaintiffs have failed to meet this threshold burden since there is no allegation that females performed tasks substantially similar to those of males. Because ". . . Congress did not intend to put . . . the courts in the business of evaluating jobs and determining what constitute[s] a proper differential for unequal work," movants' request for a decree in their favor must be denied at this time. *Hodgson v. Corning Glass Works,* 474 F.2d 226, 231 (2d Cir. 1973). This conclusion, however, does not preclude plaintiffs from showing that Uniroyal unlawfully prevented women from obtaining the higher paying positions. *Hodgson v. Golden Isles Convalescent Home, Inc.,* 468 F.2d 1256 (5th Cir. 1972) (per curiam).

### E—Alleged Segregated Personnel Office

The court further finds that during the years 1965 through 1970, the Company continued to maintain a segregated employment office in the plant. Mr. Kavanaugh continued to serve as Supervisor of Male Employment and Mrs. Hoffer continued to serve as Supervisor of Female Employment. The Supervisor of Male Employment had personnel office responsibility for "A" workers and Class A jobs; Kavanaugh continued to conduct recruiting, hiring, job assignment, job bidding, promotions, transfers, layoffs, and recalls of all male employees with respect to the Class A jobs. On the other hand, the Supervisor of Female

Employment was responsible for "B" workers and Class B jobs; Hoffer continued to conduct recruiting, hiring, job assignment, job bidding, promotions, transfers, layoffs and recalls of all female workers with respect to the Class B jobs.

### F—*The Segregated Seniority System*

Under the "A-B" System existent in the plant from 1965 through 1970, Uniroyal continued to maintain seniority lists for each department on a segregated basis according to sex. Such a practice, when used to the detriment of a particular class of employees, will be violative of federal law unless sufficiently justified. It has often been repeated that:

> [e]mployers which lay off female employees while retaining male employees with less seniority than the females commit unlawful employment practices if the discrimination against such females is on the basis of their sex.

*See, Trivett v. Tri-State Container Corp.,* 368 F.Supp. 137, 141 (E.D.Tenn.1973) and cases cited therein. Allegations respecting illegal use of this seniority system will be examined in more detail below.

### G—*The 1968–1970 Close-Down of the Footwear Divisions; Alleged Discriminatory Layoffs and Recalls on the Basis of Sex*

#### (i) *Layoffs*

On 22 March 1968, Uniroyal publicly announced plans to transfer the production of waterproof and canvas footwear from Mishawaka to the Company's plants in Naugatuck, Connecticut, and Woonsocket, Rhode Island. The decision, calling for a phaseout of footwear production over a two-year period, was expected to have a direct and substantive impact upon Uniroyal's operations and employees. The employment picture at Uniroyal before the shutdown was as follows:

**EMPLOYMENT BEFORE SHUTDOWN**

| | Male | Female | Total |
|---|---|---|---|
| Employees in Footwear Div.— | 562 | 802 | 1,364 |
| Employees in Non-Footwear Div.— | 1,152 | 529 | 1,681 |
| TOTALS— | 1,714 | 1,331 | 3,045 |

The move, therefore, came at a time when 42% of Uniroyal's work force was employed in the footwear divisions and was expected to have a disproportionate impact on female employees since approximately 59% of all females working in the plant were assigned to footwear jobs, compared to only 30% of all male workers.

Plaintiffs maintain that female employees were discriminatorily laid off by the Company as the footwear divisions were in the process of being closed down. They claim that female employees having more seniority than males were laid off while junior male employees were retained in active employment; and at the same time new male employees were hired to fill Class A jobs. The crux of plaintiffs' claim is that female employees who were affected by the shutdown could not avail themselves of the many Class A job opportunities that were available to the junior men. Plaintiffs conclude that with fewer opportunities of active employment available to them, the plaintiff class was exposed to a greater risk of being laid off than were male employees.[11]

A determination as to the validity of this claim requires examination of the labor agreement then in effect, particularly the provisions respecting the discontinuation of a product line or division. Under the 1968 agreement, an employee who was affected by such events had several alternative courses of action available to him or her. Each employee, depending upon individual circumstances, could elect to (1) retire under the provisions of the Pension, Insurance, and Severance Pay Agreement; (2) terminate employment with the Company; (3) go on layoff and, if eligible, collect sup-

---

11. Plaintiffs also contend that female employees were also exposed to a greater risk of having to quit. *See* Part IV–2, H, *infra.*

plemental unemployment benefits,[12] (4) bid on a "posted" job; (5) accept an "open" job; or (6) bump a less senior employee in accordance with Articles VII and VIII of the Wage Employee Agreement. However, considering the significant number of employees to be affected by the footwear shutdown—and the fact that many workers would undoubtedly try to bump in order to remain actively employed—there was great concern among Company officials that the bumping rules of Articles VII and VIII would seriously impair the overall operations of the plant. Based upon these fears, the Company and the Union mutually agreed upon a new set of bumping rules designed to minimize bumping by encouraging affected employees to go on layoff, quit, or retire; the determinative factor was "previous experience". The modified rules permitted employees having two or more years of seniority to bump less senior employees located anywhere in the plant, provided the affected worker had "previous experience" in the job then held by the junior employee.[13]

Thus, upon learning that his job would be affected by the footwear shutdown, a male employee met with Mr. Kavanaugh and a Union representative to discuss the various options available to him. It will be recalled that Kavanaugh's duties at this time included the selection and placement of all male employees for the Class A jobs. Thus, an affected male employee could elect to retire, quit, go on layoff, or try to stay actively employed by bidding, bumping into, or accepting another Class A job.

On the other hand, a female worker affected by the shutdown met with Mrs. Hoffer and a Union representative. Hoffer's duties under the "A–B" system complemented those of Kavanaugh; her responsibilities included the selection and placement of female employees for the Class B jobs. Thus, like her male co-workers, a female could choose to retire, quit, or go on layoff. But unlike the male worker, a female wishing to stay actively employed in the plant was restricted to seeking the "B" designated jobs. In short, Uniroyal's "A–B" employment system—without regard to the bumping requirement of previous experience—discouraged female employees from moving into 1,252 Class A jobs then present in the non-footwear divisions, thereby exposing the plaintiff class to a greater risk of layoff, termination, or retirement. As a result, female workers were being laid off by the Company while it retained junior male workers in the plant and hired 92 new male employees to fill openings in various Class A jobs.[14]

Additionally, the court finds that the modified bumping requirement of "previous experience" also had a discriminatory impact. Because of the fact that Class A jobs were held by male workers, only males could possibly have had experience needed to transfer into the remaining "A" jobs. The clause therefore had the effect of increasing a female's chance of layoff, etc., for now, in order to bump into an "A" job, she had to overcome not only the "A–B" designations, but also the requirement of previous experience.

(a) *Business Necessity*

Uniroyal maintains that during the phaseout of the footwear divisions, continu-

---

**12.** These benefits provided the employee with an amount equal to 80% of his or her weekly wage rate.

**13.** Additionally, an affected employee having at least two years of Company service had the right to bump less senior employees in the department provided the employee could qualify within a reasonably short training period. Also, an affected employee with two or more years of experience could bump the least senior employees in the division. These provisions had only short-term affects however, since all

footwear departments and divisions were closed by the end of 1970.

**14.** While it may be true that female employees could have remained in active employment by moving into another Class B job, their chances of doing so were significantly less than a male's chances of moving into a Class A job. As the graph on page 267 indicates, the 802 affected females had only 529 "B" jobs in which to move, whereas the 562 affected males had 1,252 "A" jobs available to them.

ation of its discriminatory transfer rules was required as a matter of "business necessity". If that be true, then plaintiffs' claims with respect to such discriminatory practices from 1968 to 1970 cannot stand. *Griggs v. Duke Power Co., supra* 401 U.S. at 431, 91 S.Ct. 849. Our first task is to define the proper standard by which to measure the Company's contentions.

Defendant urges the court to adopt the rationale espoused in *Trivett v. Tri-State Container Corp.,* 368 F.Supp. 137 (E.D.Tenn. 1973). In that sex discrimination case, demand for defendant's products was reduced to the extent that layoffs were required. Although Tri-State maintained a plant-wide system of seniority, Class B female folders, who were senior to some of the male general floor helpers, were laid off while the men remained in the plant. Also, at this time, the Company hired new male workers as general floor helpers. The court rejected the women's claim that Tri-State's practices infringed upon their Title VII rights:

> It appears to the Court that Tri-State had a valid judgmental decision to make concerning which employees should be laid-off during such slack periods. The lack of work occurred in the A&P department. General floor helpers could do whatever work of the class B folders as might be required, although management would be required to pay the general floor helpers 15¢ an hour more for services therein than would have been paid class B folders for the same work. On the other hand, class B folders were not qualified to do some of the heavier and higher classification work required of general floor helpers, if the latter were laid off. The Court finds, therefore, that the decision of Tri-State's management to lay off class B folders rather than general floor helpers with less seniority was for reasons other than the sex of the class B folders, and hence that there was no vio-

lation of the Civil Rights Act of 1964, Title VII, in the instance described.

*Id.* at 141.

The *Trivett* analysis is entirely too broad a standard for purposes of justifying discriminatory actions. Its holding would ostensibly exempt from the Act all employment decisions having a business purpose; but *necessity,* not *purpose,* is the proper test. *United States v. N. L. Industries,* 479 F.2d 354 (8th Cir. 1973). The sweeping definition suggested in *Trivett* would seriously undermine the policy of Title VII, which today represents the principal means of ensuring that an individual's ability will be the determinative factor in employment opportunities. If the Act is to remain a potent force against discriminatory employment practices, the defense must be narrowly construed and confined to those unusual instances where a segregative policy is absolutely essential to the achievement of a legitimate business need.

This is the rationale which underlies the test announced by the Fourth Circuit in *Robinson v. Lorillard Corp.,* 444 F.2d 791 (4th Cir. 1971). There the court stated that:

> The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be *sufficiently compelling* to override any racial impact; the challenged practice *must effectively carry out the business purpose* it is alleged to serve; and there must be available *no acceptable alternative policies* or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact.

*Id.* at 798 (emphasis added); [15] see also, *United States v. St. Louis-San Francisco Ry. Co.,* 464 F.2d 301 (8th Cir. 1972); *United States v. Jacksonville Terminal Co.,* 451

---

**15.** Although *Robinson* involved racial discrimination, the business necessity exception in a racial context has been said to apply with equal force in a sexual context. *See Chastang v.*

*Flynn & Enrich Co.,* 365 F.Supp. 957, 966 (D.M. 1973), *affirmed* 541 F.2d 1040, 1042–43 (4th Cir. 1976).

F.2d 418 (5th Cir. 1971); and *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 662 (2nd Cir. 1971).

There can be no doubt that *Robinson's* three-pronged test represents the better view; however, a problem arises with respect to the burden of establishing the final portion of the defense (no acceptable alternative policy). The difficulty was explained and resolved fairly in *Crockett v. Green,* 388 F.Supp. 912 (E.D.Wisc.1975):

> Literally applied, the "no alternative" approach to "business necessity" in the case law and the E.E.O.C. Guidelines, 29 C.F.R. § 1607.3, places upon an employer the practically impossible burden of proving an absolute negative, i. e., the nonexistence of any alternative procedures. A fair and preferable allocation of the burden of proof on the existence of alternatives would place upon the plaintiff the burden of initially proposing or suggesting reasonable alternative practices while leaving to the employer the ultimate burden of demonstrating that any suggested alternatives are not adequate substitutes for its present practices.

*Id.* at 920.

Since the court is now considering plaintiffs' motion for summary judgment, however, the ultimate burden of demonstrating the adequacy of a suggested alternative must also be shouldered by plaintiffs.[16] Rule 56, F.R.C.P. It is with these factors in mind that we turn to the allegations presented in this case.

The Company maintains that if employees affected by the footwear close-down had bumped in accordance with the pre-1968 transfer rules *as written,* the effect would have been the loss of business, severe economic losses, and consequently the loss of more jobs.

**16.** The *Crockett* decision is mentioned by the court in response to defendant's concern about the burden of proof imposed upon an employer

(b) *Training Costs*

Defendant's initial contention is that the implementation of nondiscriminatory transfer rules during the footwear shutdown would have been prohibitively expensive. The following graph is taken from the affidavit of Uniroyal's Manager of Industrial Engineering, William T. Bailey.

GRAPH NO. 1

| | 1968 | 1969 | 1970 |
|---|---|---|---|
| Adhesives | NS* | NS | NS |
| Automats | 5.3% | 4.2% | 2.8 |
| Coated Fabrics (Incl. Knitting) | 4.5 | 3.2 | .4 |
| Custom Processing | No Sales | No Sales | NS |
| Auto Foam & Foam Specialties | 20.9 | 19.1 | 2.3** |
| Engineered Systems (Incl. Filatex) | 17.2 | 752.6** | 2.4** |
| ENSOLITE | 6.0 | 2.4 | .3 |
| Weighted Average Loss (NIAT)— | 9.2% | 8.2% | 2.5% |

\* — Not Significant
\*\* — Increased Losses

These projections are based upon the anticipated cost of having to train affected employees for their new positions; training costs for each commodity are set forth on the following page.

Defendant's first "business necessity" argument fails to raise a cognizable defense. Uniroyal's expectation of an additional $1,885,658.00 in expenses is premised upon the assumption that each affected worker would bump on the average of 2.8 times. Graph No. 2, Column III. As plaintiffs suggest, however, these expenses could have been significantly reduced without discriminating on the basis of sex by permitting all employees only one opportunity to bump. Such a plan would have reduced costs by an estimated $1,212,209.00. Training costs could have been further minimized by requiring employees to bump into those jobs where the average costs were low, and prohibiting employees from bumping into jobs where costs were high. Graph No. 2, Column V.

under the "no-alternative" approach. *Crockett's* allocation of burdens will be controlling in this case.

GRAPH NO. 2

TRAINING COST BY COMMODITY *

| | | I | | II | | III | | IV | | V | | VI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Commodity | % of Population | x | Net Displaced Footwear Personnel | x | Bumps Per Occur. | x | Disquali-fication Rate | x | Training Cost (Including Scrap) Per Occur. | = | Cost to Commodity |
| 1968 — | Knit Fabrics | 9.0% | | 468 | | 2.8 | | 1.15 | | $ 367.78 | | $ 49,880 |
| | Coated Fabrics | 6.6 | | 468 | | 2.8 | | 1.15 | | 2,083.24 | | 207,193 |
| | Automats | 10.5 | | 468 | | 2.8 | | 1.15 | | 453.34 | | 71,733 |
| | ENSOLITE | 7.3 | | 468 | | 2.8 | | 1.15 | | 430.86 | | 47,398 |
| | KOYLON | 23.8 | | 468 | | 2.8 | | 1.15 | | 1,272.60 | | 456,426 |
| | Fuel Cells | 38.4 | | 468 | | 2.8 | | 1.27 | | 477.04 | | 304,855 |
| | Filatex | 4.4 | | 468 | | 2.8 | | 1.15 | | 448.45 | | 29,734 |
| | TOTAL 1968— | 100.0% | | | | | | | | | | $1,167,224 |
| 1969 | Knit Fabrics | 9.0% | | 288 | | 2.8 | | 1.15 | | $ 367.78 | | $ 30,696 |
| | Coated Fabrics | 6.6 | | 288 | | 2.8 | | 1.15 | | 2,083.24 | | 127,506 |
| | Automats | 10.5 | | 288 | | 2.8 | | 1.15 | | 453.34 | | 44,144 |
| | ENSOLITE | 7.3 | | 288 | | 2.8 | | 1.15 | | 430.86 | | 29,168 |
| | KOYLON | 23.8 | | 288 | | 2.8 | | 1.15 | | 1,272.60 | | 280,877 |
| | Fuel Cells | 38.4 | | 288 | | 2.8 | | 1.27 | | 477.40 | | 187,745 |
| | Filatex | 4.4 | | 288 | | 2.8 | | 1.15 | | 488.45 | | 18,298 |
| | TOTAL 1969 | 100.0% | | | | | | | | | | $ 718,434 |
| | | | | | | COMBINED 1968 & 1969 TOTAL— | | | | | | $1,885,658 ** |

* These figures do not include possible economic losses resulting from the loss of customers due to an inability of the company to promptly supply its products.

** This amount does not include the additional cost of $82,306.00 that would have been incurred in 1970 due to closing out the stitching operations that were maintained after the phase-out of the footwear divisions to provide stitched parts for the company's plant in Thompson, Georgia.

Using defendant's data, it appears that the adoption of a nondiscriminating bumping policy would have cost the Company less than $600,000, thereby reducing NIAT by roughly 3% in 1968, 2.8% in 1969, and .8% in 1970. The question, therefore, is whether Title VII may require an employer to withstand a 2.2% [(.03 + .028 + .008)/3] average reduction in NIAT over a three-year period in order that both male and female workers have the same employment opportunity available to them.

The court has examined many cases wherein defendants have similarly raised the cost factor as a defense. What evolves from these cases is the notion that dollar cost alone is an immaterial consideration under the business necessity doctrine, except when expenditures of monies may curtail operations to the extent that incumbent employees may lose their jobs.

The principle that employers who wrongfully discriminate must bear the cost of remedying that discrimination is exemplified in *Johnson v. Pike Corp. of America,* 332 F.Supp. 490 (C.D.Cal.1971). There the court noted that:

> The sole permissible reason for discriminating against actual or prospective employees involves the individual's capability to perform the job effectively. This approach leaves no room for arguments regarding inconvenience, annoyance *or even expense to the employer.*

*Id.* at 495. (Emphasis added.)

Similarly, the *Robinson* court held "that avoidance of the expense of changing employment practices is not a business purpose that will validate the [discriminatory] effects of an otherwise unlawful employment practice". 444 F.2d at 800. *See also, United States v. N. L. Industries, supra,* at 366; and *United States v. St. Louis-San Francisco Ry. Co.,* 464 F.2d 301, 310, 311 (8th Cir. 1972), *Cf.* 84 Harv.L.Rev., *supra,* at 1149–50.

In the case at bar there is no claim that incumbent employees would lose their jobs as a consequence of the additional expenses; hence, the court must reject the Company's initial contention.

### (c) Decreasing Sales and the Possible Loss of Jobs

The record does show that in 1968 Company officials feared the consequences that mass bumping might have upon the sales of non-footwear products as hundreds of inexperienced laborers transferred into those divisions. Donald Frey, the Company's Manager of Industrial Relations, testified that:

> . . . In the business we're in today it's a highly competitive business. And we deal a great deal with the motor industry. And the motor industry is notorious for not having a single source for parts for their cars. And you either supply them what they want at the time they want it or they'll go to another source. It can mean loss of business to you.
>
> \* \* \* \* \* \*
>
> Well, at the time we started the Footwear phaseout, approximately fifty per cent of the membership in Local 65 were in Footwear Operations, which would have meant that we would have affected every commodity in the plant adversely.
>
> \* \* \* \* \* \*
>
> Better than fifty per cent of our business was automotive at the time of the Footwear phaseout. . . . discounting the Footwear.

(Deposition of Donald Frey, pp. 18, 137–139.)

Frey also testified that more jobs may have been lost as a result of the pre-1968 bumping rules.

Although additional expenses and a decline in sales may, at least for accounting purposes, reduce NIAT by the same amount, a court must be sensitive to the differing impacts the two transactions may have. Depending upon the nature of a particular employer and his customers, plummeting sales may have weightier affects than extraordinary expenses. For example, if, because of a sudden drop in the efficiency of his workers, an employer is unable to supply the demands of his buyers, product sales will immediately fall and customers may be permanently lost. If the reduction in sales is substantial, it may mean a similar reduction in the size of the existing work force. Unlike extraordinary expenses, the impact of which is generally limited to the year in which it is paid or incurred, a decrease in sales volume may likely have more severe short-term and long-term affects and should, therefore, be accorded more significance under the business necessity defense.

The above scenario closely describes Uniroyal's predicament in 1968. With approximately 600 persons expected to transfer into jobs which they never before held, inefficiency was expected to seriously hamper production and sales. The need for maximum efficiency at Uniroyal appears to be especially acute in view of the fact that greater than 50% of the company's business was then derived from the "highly competitive" auto industry. Frey's affidavit states that if Uniroyal was unable to meet a buyer's immediate demands, another manufacturer would be most willing to do so.

It will be recalled that the first part of *Robinson's* test, requiring the challenged practice to effectively carry out the purpose it is alleged to serve, is undoubtedly satisfied in this case. Certainly, maintenance of the discriminatory transfer rules kept inefficiency in the non-footwear divisions to an absolute minimum.

However, as for the second part of the test, that the alleged business purpose must be sufficiently compelling to override its discriminatory impact, a material issue of fact exists. Here, the court must judicially balance the competing interests of the litigants; in other words, the adverse impact that less discriminatory transfer rules would have had from 1968 through 1970 upon production, sales, and workers in the plant, must be measured against the degree of sex discrimination experienced in the plant. Although the latter factor has been

presented to the court, plaintiffs have failed to show, as they must on a motion for summary judgment, the full extent that nondiscriminatory rules would have had on the enterprise. Defendant has shown that such a program could have meant the loss of business and possibly jobs. The evidence, which plaintiffs do not challenge, presents an argument which may *at some point* constitute a compelling reason for not implementing a nondiscriminatory employment system. To now conclude as a matter of law that defendant's argument cannot prevail would contravene the narrow purpose of Rule 56, F.R.C.P. Therefore, without adequate information to place on both sides of the scale, the court is unable to properly evaluate the business necessity defense. Since there is not sufficient information before the court to resolve the matter, each party shall submit such evidence as it deems necessary to support its respective position. Plaintiffs shall file their information within 60 days of this Order, and defendant shall have 30 days from the filing of such data to respond.

Likewise, an issue requiring additional evidence also exists in connection with the final portion of the business necessity test, i. e., that no acceptable policy or practice would accomplish the business purpose equally well with a lesser discriminatory impact. Plaintiffs have suggested that Uniroyal could have limited each employee to one opportunity to bump into any job in the plant; also, efficiency may have been preserved by prohibiting employees from moving into jobs requiring long training periods.[17] Perhaps the affects of the proposed slow-down could have been further mitigated by having experienced employees work overtime or by building inventories prior to the footwear shut-down. Whether such steps were either practical or feasible in 1968 is a matter not ascertainable from the record now before the court. Alternative policies must be framed in more precise

terms in order to satisfy movants' burden of proof. *See, Crockett v. Green, supra,* at 320. The parties shall provide the court with the necessary information in the manner prescribed in the preceding paragraph.

(ii) *Recalls*

The Company's admissions to plaintiffs' requests to admit facts show that from June to December 1969, and again from June to August 1970, the Company recalled some of its laid-off employees to active employment. In making these recalls, Uniroyal unlawfully segregated job opportunities on the basis of sex in at least two respects. First, the Supervisor of Male Employment recalled male employees to fill vacancies in traditionally "male" or "A" jobs; the Supervisor of Female Employment recalled female employees to fill vacancies in "female" or "B" jobs. Once again, females did not have equal access to the many Class A jobs. Irrespective of an individual's present wishes and abilities, employees were considered for certain jobs and not others based upon his or her sex.

Secondly, recalls were made using different seniority dates for male and female workers. Because the female seniority date was always earlier than the male seniority date, the Company recalled junior male employees in active employment while senior female employees remained laid off. See Part IV, 2, F. Defendant does not and, indeed, cannot rely upon the business necessity defense discussed above.

H—*Allegations that Uniroyal Discriminatorily Caused Its Female Workers to Quit*

(i) *Terminations Due to Alleged Discriminatory Cutoff of Supplemental Unemployment Benefits*

The Supplemental Unemployment Benefit Agreement of 1967 provided that em-

---

**17.** The average training periods per commodity were as follows:

| Commodity | Average Number of Days |
|---|---|
| Knit Fabrics— | 13 |
| Coated Fabrics— | 11 |
| Automats— | 7 |
| Ensolite— | 5 |
| Koylon— | 10 |
| Fuel Cells— | 30 |
| Filatex— | 30 |

ployees who are laid off as the result of an operation or plant shut-down and who have more than one but less than five years seniority are eligible to receive 80% of his or her weekly straight-time rate.[18] In March 1968 the Company decided to extend this privilege to employees with five or more years of service who had been laid off out of line of seniority as the footwear phaseout began. These workers were "gratuitously" deemed by the Company to be on "temporary layoff" within the meaning of § 4(a) of the S.U.B. agreement. The affidavit of Donald L. Frey states:

[t]he reason for this decision was that (1) the Company was anticipating new business which might entail recalling the laid-off employees, and (2) the S.U.B. would soften the economic impact of the layoff in regard to the seven employees.

By November 1969, however, product sales indicated that it would be "highly unlikely" that persons laid off would be recalled. Uniroyal therefore decided to change its previous position by revoking the economic largess it had bestowed upon employees with five or more years of experience. A letter [19] was drafted by Company officials and mailed to affected workers, advising each employee that S.U.B. had been terminated and that he or she could elect to take a termination allowance and lose all service and seniority with the Company, or elect to stay on layoff and hope to some day be recalled to active employment. Plaintiffs maintain that these notices were delivered to a disproportionate number of female employees and that the letters caused a greater proportion of females to terminate their employment relationship with Uniroyal. The Company also seeks a decree in its favor with respect to this claim.

The S.U.B. termination letters were mailed on three different occasions; the first was 12 November 1969. The record shows that these letters were first sent to employees on layoff having seniority dates ranging from 1959 to 1963 inclusive ("Group I"). Despite the fact that on November 12th the Company had 92 male and 171 female workers in active employment or on layoff status with such seniority dates, all 157 letters sent that day by the Company were delivered to female employees.[20]

On 26 December 1969, a second wave of notices were mailed to a group of laid-off workers with seniority dates ranging from 7 September 1955 to 29 August 1959 ("Group II"). Once again, only female workers had their benefits discontinued even though the Company had 140 males and 236 females in active employment or on

---

18. On the other hand, employees possessing five or more years of Company service are eligible for a termination allowance as provided by the Pension, Insurance and Severance Pay Agreement. That Agreement also provides that persons with at least ten years of seniority and 62 years of age are eligible for certain pension benefits.

19. The letter reads in pertinent part:
Dear Fellow Employee:
As a result of analyzing our employment needs in the foreseeable future, the probability of your being recalled from layoff is very remote. Based on this information, together with the recent closing down of the Footwear section of the Plant, it has been determined that you are eligible for a benefit in the form of a termination allowance under the provisions of the Pension, Insurance and Severance Pay Agreement. Since you are eligible for this benefit, under the terms of the Supplemental Unemployment Benefits Plan you are no longer eligible for S.U.B.

after November 21, 1969. You have the right to exercise the following options:
A. You may elect to take a termination allowance, in which case your service and seniority with the company will be terminated, or
B. You may elect to remain on the recall list and take your chances that some day you may be recalled.

20. The court is primarily interested in the sex and number of employees on layoff status having seniority dates from 1959 to 1963. Plaintiffs' evidence, however, includes the number of employees who were also actively working in the plant. Although the figures may be somewhat misleading, they do not require the court to deny plaintiffs' claim. The statistical disparity would exist so long as *some* males and *some* females were on layoff when the notices were delivered only to members of the latter group.

layoff status with the appropriate time of company service.[21]

On 13 January 1970, plaintiffs filed a complaint with the E.E.O.C., charging Uniroyal with various discriminatory practices on the basis of sex, including complaints concerning the Company's cutoff of S.U.B. payments. Shortly thereafter, on 6 February 1970, Uniroyal released a final wave of letters. These notices were sent not only to the oldest seniority group of employees (1952–1955, "Group III"), but also to workers with dates ranging from 1955 to 1963. For the first time Uniroyal terminated the benefits of male workers. In February the Company delivered the last letters to 159 men and 192 women at a time when it had 534 males and 216 females in active employment or on layoff with seniority dates from 1952 to 1963.

It is clear that both the November and December letters were mailed to a disproportionate number of females in Groups I and II. It is equally clear that a greater proportion of said females terminated their employment relationship soon after receiving the S.U.B. letters. The evidence shows that 169 females having their S.U.B. payments cut off in 1969 decided to quit; at least 93 of these women did so before the first male worker received a similar notice.

Uniroyal, however, looks to the overall statistical results of its policy to show that it was not discriminatory. The Company maintains that when the impact of the third wave of letters are considered, plaintiffs' case must fail. Uniroyal points out that 57.23% (91/159)[22] of the males receiving an S.U.B. letter chose to quit as compared to only 36.21% (201/555)[23] of the women.

Defendant's argument fails to raise a valid defense. Action taken by an employer subsequent to the filing of E.E.O.C. charges cannot moot issues of discrimination occurring prior to that time. To hold otherwise would permit a potential defendant to simply manipulate the statistical evidence in order to avoid liability under Title VII. Although Title VII encourages conciliatory action, it does not condone concealment. Thus, once having restricted an employee's job opportunities on the basis of sex, it is no excuse that members of another group were subjected to similar limitations after E.E.O.C. charges were filed. *See, McCoy v. Safeway Stores, Inc.,* 5 FEP Cas. 628 (D.C.1973). *See, also, Jenkins v. United Gas Corp.,* 400 F.2d 28 (5th Cir. 1968) (corrective action taken subsequent to filing of lawsuit in federal court considered irrelevant).

The Company also argues that since it voluntarily and gratuitously extended S.U.B. payments to employees with five or more years of experience, it may revoke its largess in any manner and at any time as it sees fit. The court is unable to agree. Section 2000e–2, which is entitled to "broad construction", *Sale v. Waverly Shell Rock Bd. of Educ.,* 390 F.Supp. 784, 788 (N.D.Ia. 1975), is in no way limited to contractual duties; rather, it is designed to prohibit all practices which "in any way" limit or restrict an individual's employment opportunities. Focus must be placed upon the consequences of a particular policy in contradistinction to the nature or source of that activity. *Griggs v. Duke Power Co., supra,* 401 U.S. at pp. 429–30, 91 S.Ct. 496.[24]

Next, Uniroyal submits that the instant claim is without merit because the resigna-

---

21. *Ibid.*

22. Of the 159 men receiving an S.U.B. letter, 91 later quit.

23. Of the 555 women receiving an S.U.B. letter, 201 later quit.

24. The foregoing conclusion is analogous to the Supreme Court's construction of the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution. The Court has made it clear that once the government gratuitously bestows some benefit or privilege upon its citizenry, that benefit or privilege may be revoked, but only in accordance with the Due Process Clause. *See, e. g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Note, *Reputation as a Constitutionally Protectible Interest,* 52 Notre Dame Law 290, 300–302 (1976). It does not, therefore, appear to be too onerous a task to require an employer, when withdrawing its largess, to do so within the parameters of Title VII.

tions which eventually ensued do not fall within the strict definition of a "constructive discharge." This concept, which was originally developed under the National Labor Relations Act and later extended to Title VII actions, is explained in *Young v. Southwestern Savings & Loan Ass'n.*, 509 F.2d 140, 144 (5th Cir. 1975):

> [I]f the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it formally discharged the aggrieved employee.

Here, defendant reasons that because working conditions at the Mishawaka plant are not at issue, and because there is no evidence that S.U.B. letters forced any female worker to quit her job, the doctrine of constructive discharge is inapplicable. The court, however, is unconvinced.

Whenever a legal concept is taken from its original context and applied in another, it must adapt itself to the many different nuances encountered in the new environment. A court must stand ready to refine the general principles underlying the doctrine without losing sight of its intended purpose.[25] In the present case, at least one factor of a constructive discharge, which appears to be an essential ingredient in N.L.R.A. cases, loses much of its significance when placed alongside the "well-settled" principles of Title VII.

To illustrate, Uniroyal urges the court to dismiss plaintiffs' claim since there are no allegations of oppressive or unbearable working conditions. However, the atmosphere in which an employee must perform his assignments represent just one means or form of coercion. In a case such as this, the nature and form of defendant's conduct is immaterial. The Supreme Court recently stated that "in enacting Title VII . . . Congress intended to prohibit all practices *in whatever form* which create inequality in employment opportunity." *Franks v. Bowman, Inc.*, 424 U.S. 747, 763, 96 S.Ct. 1251, 1263, 47 L.Ed.2d 444, 461 (1976). (Emphasis added.) The Act, then, directs the court to examine the substance and affect of a challenged practice, rather than the form in which it appears. *Cf., Griggs v. Duke Power Co., supra,* 401 U.S. at 432, 91 S.Ct. 496.

■ Additionally, Uniroyal maintains that dismissal is warranted since there is no evidence that termination of S.U.B. payments actually "caused" or "forced" any worker to quit his or her job. But plaintiffs' burden is not that great, at least for purposes of this motion. The court has determined that termination of S.U.B. payments in 1969 had discriminatory consequences against the class members of Groups I and II. That is the only question that may be resolved at this juncture. Whether an individual member of the class was forced to resign as a result of Uniroyal's actions, or whether her decision to quit was voluntary will present a series of factual issues for the trier of fact.

■ Similarly, defendant cannot rely upon the defense of business necessity. Although it appears that sound business reasons supported the decision to cut off S.U.B. payments, there is no explanation as to why the policy had to be conducted in a manner such that only women with seniority dates ranging from 7 September 1955 to 28 June 1963 received S.U.B. letters, while male workers with similar dates remained unaffected until February 1970.

■ Lastly, with respect to the class members of Group III, summary judgment must be denied both parties. In order to rule on this matter, it is essential to know the number of male and female employees on layoff status as of 6 February 1970 having seniority dates from 1952 to 1955; the number of S.U.B. letters sent to members of both sexes; and the number of employees who later resigned. That information, although given with respect to Groups I and

---

**25.** In *Young v. Southeastern Savings & Loan Ass'n., supra,* it was the district court's failure to recognize this important factor that required the Circuit Court to reverse the lower ruling. *See,* 509 F.2d 140 (5th Cir. 1975).

II, is not available for the third group. Thus, whether females having the 1952–1955 seniority dates were also discriminated against is a question the court is unable to answer at this juncture. The court invites each side to submit, in the manner prescribed above, all information needed to resolve this question. (If it so desires, defendant may also move for summary judgment on this point when it responds to plaintiffs' brief.)

(ii) *Terminations Due to Alleged Discriminatory Layoffs and Recalls*

It is plaintiffs' contention that during the footwear phaseout discussed above, the Company wrongfully laid off female employees with more seniority than men who remained working in the plant. The record shows that many of these women on layoff subsequently decided to quit by accepting early pensions, by taking severance pay, or otherwise. Plaintiffs therefore conclude that Uniroyal unlawfully caused senior female employees to quit by first conducting discriminatory layoffs and then by preventing them from reentering the plant by conducting segregative recalls.

The instant claim, of course, hinges in part upon a finding that the Company conducted illegal layoffs from 1968 through 1970. As noted, however, additional evidence is needed to finally resolve the matter. Thus, plaintiffs' claim cannot be decided until the layoff issue has been determined.

3. *1971—Present*

A—*Alleged Discriminatory Classification of Jobs*

Defendant's admissions to plaintiffs' requests to admit facts established the following: In January 1971, Company officials requested its Manager of Safety and Security, Mr. Von G. Cork, and its plant physician, Dr. N. C. Johns, to observe certain traditional "male" jobs in the plant to determine whether those jobs should be performed by female employees. Cork and Johns toured the facility once each week from 13 January through 30 June 1970,

observing the various tasks performed. From January through July 1971, Dr. Johns issued to E. L. Kavanaugh and Elizabeth Hoffer 14 lists of jobs that, in his opinion, "should not be performed by female employees". The Company notified the Union of Dr. Johns' recommendations and in March 1971 Uniroyal incorporated the doctor's observations into its regular procedure of writing job descriptions.

Plaintiffs maintain that Uniroyal's classification of certain jobs as those which "should not be performed by females" unlawfully discriminates on the basis of sex. The court agrees. *In Rosenfeld v. Southern Pacific Co.*, 444 F.2d 1219 (9th Cir. 1971), the Ninth Circuit considered the question of whether strenuous physical demands and long working hours constituted a "bona fide occupational qualification". 42 U.S.C. § 2000e–2(e) (1974). The court replied in the negative, explaining at page 1225:

The premise of Title VII, the wisdom of which is not in question here, is that women are now to be on equal footing with men. *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228, 236 (5th Cir. 1969). *The footing is not equal if a male employee may be appointed to a particular position on a showing that he is physically qualified, but a female employee is denied an opportunity to demonstrate personal physical qualification.* Equality of footing is established only if employees otherwise entitled to the position, whether male or female, are excluded only upon a showing of individual incapacity. *See Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 718 (7th Cir. 1969). This alone accords with the Congressional purpose to eliminate subjective assumptions and traditional stereotyped conceptions regarding the physical ability of women to do particular work. *See Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228, 235–236 (5th Cir. 1969); *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 717 (7th Cir. 1969). *See also Shultz v. First Victoria Nat'l Bank*, 420 F.2d 648, 656 (5th Cir. 1969),

(interpreting the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1)).

(Emphasis supplied.)

■ An employer may not, therefore, exclude females from particular jobs on the grounds they involve laborious tasks and long hours of work. Title VII rights are individual rights; they are not lost or forfeited because some members of a group having similar sex, racial or religious characteristics are unable or unwilling to perform certain jobs. Defendant presents nothing to remove the instant claim from *Rosenfeld's* holding. Consequently, the court finds that Uniroyal's classification of jobs as those which "should not be performed by females" is violative of Title VII. The inherent danger of such classification scheme can be seen in the case of Frances Klaer, a female employee who, in 1971, tried to exercise her seniority by transferring into a job designated as one that "should not be performed by female employees". In November 1971, Uniroyal had Dr. Johns reexamine the job that Klaer wanted and to discuss it with her. Johns' conclusion was that Klaer "could not qualify physically for the job". The Company relied upon Johns' opinion in its defense before an arbitrator. The arbitrator rejected the company's defense and ordered Uniroyal to award Klaer her job together with back pay. She had worked regularly on the job since 1972.

B—*Alleged Discriminatory Recalls of Employees Subsequent to December 1970*

In December 1970 the Company abandoned its practice of using separate seniority dates for purposes of recalling laid-off male and female employees and began using a single seniority date for all employees. Although at first blush the new system appears to be nondiscriminatory, in operation it is detrimental to female employees. Under the new system, employees on layoff were considered for job vacancies on the basis of company service. However, the Company solely determined whether or not the most senior employees were capable of performing a particular job based upon the job's description and the physical attributes of the employee, including sex.

It will be recalled that beginning in 1971, descriptions of many traditionally "male" jobs were designated as jobs that "should not be performed by female employees". The Employment Office used the job descriptions when recalling employees, placing only male workers in those jobs which Dr. Johns had found to be injurious to a woman's health.[26] Thus, a female who is senior to a male employee would first be considered to fill a job vacancy but she would not be recalled if the job was one that "should not be performed by female employees". In many instances then, a female's sex, rather than her relative seniority and individual capabilities, is the determinative factor with respect to recalls occurring subsequent to December 1970.

Furthermore, in 1971 the Company hired 45 males as new employees and assigned them to traditional "A" jobs without considering any of its 130 female employees who were on layoff throughout the entire year.[27] Many of these jobs have since been

---

**26.** In an intra-office memorandum dated 16 March 1971, E. L. Kavanaugh, Uniroyal's current Employment Manager, stated:

> Although we have only one seniority layoff date, we operate with a more "realistic" date as far as men are concerned, in order to:
>
> \* \* \* \* \* \*
>
> B. Keep jobs manned where the plant physician and safety department recommend should not be performed by females as they would be injurious to their health.

**27.** The following chart shows the number and sex of workers hired by Uniroyal as new employees from 1968 to 1973:

| Year | Male | Female |
|------|------|--------|
| 1968 | 92 | 0 |
| 1969 | 0 | 0 |
| 1970 | 11 | 0 |
| 1971 | 45 | 0 |
| 1972 | 158 | 0 |
| 1973 | 4 | 0 |

successfully held by members of both sexes.[28]

## C—*Alleged Discriminatory Bidding and Disqualification Rules*

Since 1964 the collective bargaining agreement between the defendants has contained the following rules: (1) an employee who is disqualified from a job has no right to bump junior employees; (2) a disqualified worker may only bid on a "posted" job vacancy or agree to accept an "open" job through the Employment Office; and (3) each employee is limited to two voluntary job transfers through bidding within one year. It is required that thirty days must elapse between transfers by bidding.

Plaintiffs interpret these provisions to mean that an employee who successfully bids on a job but is disqualified within thirty days can remain in active employment only by accepting an "open" job through the Employment Office. If there are no such jobs available, the employee is laid off. Once laid off, the employee cannot bid on a "posted" job vacancy even when the 30-day period following the worker's last bid has elapsed. It is plaintiffs' contention that the rules operate so as to perpetuate the effects of Uniroyal's prior discriminatory practices in violation of Title VII. While not disputing plaintiffs' interpretation of the bargaining agreement, defendant does challenge the legal conclusions which have been drawn. Defendant says that because the same bidding rules apply with equal force to both males and females, they are valid under the Act. Each party moves the court for an order in its favor.

Without question, the provisions of the bargaining agreement apply equally with respect to members of both sexes. But, contrary to defendant's contention, that factor alone does not end the inquiry for neutral employment practices which tend to "lock in" the affects of prior discrimination

are also unlawful. *See, e. g., Griggs v. Duke Power Co., supra; United States v. Georgia Power Co.,* 474 F.2d 906 (5th Cir. 1973); and *United States v. Bethlehem Steel Corp., supra.*

The bidding and disqualification rules now under consideration have the prohibited affect of "locking" female employees to the formerly designated "female" or "Class B" jobs. To illustrate, suppose that M and F were hired by the Company prior to 1972 and assigned to positions on the basis of sex—M being assigned to a "male" or "Class A" job, and F to a "female" or "Class B" job. Suppose further that F now seeks to voluntarily transfer into a position traditionally held by male employees. To do this, she must bid in accordance with the above rules which, as seen, expose her to the possibility of layoff and possibly unemployment, should she fail to satisfactorily perform her new duties.

Undoubtedly, the serious penalties which lurk beneath the rules can only discourage F and other females from voluntarily transferring within the plant. Although clearly permitted to do so, a transfer may ultimately cost the employee active employment with the Company. Irrespective of their intended results, the rules help to "immobilize" defendant's work force by encouraging F to remain in her original job. The rules therefore tend to "freeze" the segregative effects of defendant's prior discriminatory practices and permit them to continue into the present. For that reason the Company's bidding and disqualification rules are unlawful. See Note 9.

The following chart shows the virtual standstill which has existed under Uniroyal's bidding rules from 1970 to 1974:

| | Number of Departments | | |
|---|---|---|---|
| Year | All Male | All Female | Male & Female |
| 1970 | 61 | 4 | 24 |
| 1974 | 51 | 1 | 23 |

**28.** During 1971 the defendant Uniroyal assigned 12 of its 45 newly hired male employees to the following jobs and departments without considering senior female employees for them: Janitor (197), inspect and pack (234), roller die operator (255), clean molds (264), pour and control (264), demold (265), and clean molds (265). Thereafter, as the defendant Company opened those jobs to female employees gradually during the period 1971–1973, fifty-seven senior female employees obtained those jobs and worked them successfully.

It is inconsequential that male employees are also subject to the possibilities of layoff and unemployment when considering a voluntary transfer. The determinative factor here is not whether the employment practice applies equally to both sexes, but whether it tends to perpetrate the effects of prior discriminatory conduct.

*See, Ibid.*

### D—*Alleged Discriminatory Bumping and Disqualification Rules*

Both parties next seek a determination of whether the bumping and disqualification rules contained in the 1970 collective bargaining agreement encroach federal law. The agreement provides penalties for bumping which track those respecting job bidding. That is, an employee who bumps into a job but is later disqualified because of his or her inability to do the work, can stay in active employment only by bidding on a "posted" job vacancy or being placed on an "open" job by the Employment Office. If such jobs are unavailable, the employee is laid off. For reasons stated in the preceding section, these rules are found to be violative of Title VII.

The parties are also at odds concerning the bumping requirement that an employee have "previous experience" in the job which he or she desires to hold. The applicable portion of the agreement reads as follows:

Where an employee's job is eliminated either due to method and equipment changes, or where a product or a division is permanently discontinued, said employee may—

1. Accept open jobs within the plant,

2. *Replace less senior employees on jobs within the plant for which they can qualify by previous experience,*

3. Replace less senior employees on jobs within the plant for which they can qualify within a reasonably short training period.

The qualifications of the employee and the length of training periods for various jobs shall be subject to negotiation.

\* \* \* \* \* \*

4. Any person replaced by an employee entitled to job elimination rights shall be entitled to the same degree of replacement rights as was actually exercised by the preceding employee.

\* \* \* \* \* \*

Whenever new products are established in production and changes are made in the first six (6) months of the products manufacture which result in what would normally involve job elimination rights, any individual so affected shall have surplus labor rights and not elimination rights.

\* \* \* \* \* \*

Where employees with over two (2) years seniority who are surplus labor on any job in any department for reasons other than noted in Paragraph B above, they shall be subject to the following provisions:

1. Accept "open" jobs within the plant.

2. *Senior employees' may bump less senior employees on jobs anywhere in the plant provided they can qualify by reason of previous experience.*

3. They may remain in the department by bumping less senior employees provided they can qualify within a reasonably short training period.

4. If not qualified by previous experience or cannot qualify within a reasonably short training period, they shall replace the least senior employee in the division. The least senior employee thereby affected shall replace least senior employees in the plant.

\* \* \* \* \* \*

 Such a proviso has already been found by the court to be discriminatory on the basis of sex. See Part IV, 2–G. In short, the reason for this conclusion is that only male employees have the experience needed to bump into the formerly designated "male" or "Class A" jobs. As a consequence, female employees are "locked" into

their original assignments. There being no tenable explanation for restricting one's privilege to bump on the basis of previous experience, the court finds the requirement invalid under Title VII.[29]

## V—PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT LOCAL UNION NO. 65

Defendant Local Union No. 65, United Rubber Workers, is the exclusive collective bargaining representative of all production and maintenance employees at the plant. Plaintiffs claim that the Union discriminated against female employees on the basis of sex in contravention of Title VII and the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1970).[30]

With regard to the National Labor Relations Act, the plaintiff class maintains that Local No. 65 failed to represent fairly the female membership of the collective bargaining unit when negotiating with the Company. This representative duty is not expressly provided for in the N.L.R.A. Its existence stems from a series of decisions by the Supreme Court which have construed Sections 157 and 158(b)(1)(A) of Title 29 as impliedly placing an obligation upon a labor representative to represent fairly the interests of its membership. Clark, *The Duty of Fair Representation: A Theoretical Structure*, 51 Tex.L.Rev. 1119 (1973). The Court has stated that "[a] breach of the statutory duty of fair representation occurs only when a union's conduct towards a member of the collective bargaining unit is arbitrary, *discriminatory*, or in bad faith". *Vaca v. Sipes*, 386 U.S. at 190, 87 S.Ct. at 916. (Emphasis supplied.) Although the court was silent with respect to the "type" of discrimination it intended to prohibit, the duty has been held to require equal treatment on the basis of sex. *Glus v. Murphy Co., supra*. Thus, where a labor representative negotiates a contract which in operation discriminates among its members according to their sex, it will have failed to meet the dictates of the N.L.R.A. *Ibid.; cf. Macklin v. Spector Freight Systems, Inc.*, 156 U.S.App.D.C. 69, 79–88, 478 F.2d 979, 989–990 (1973).

Plaintiffs have divided their claims into three categories, the first of which involves allegations that the Union maintained discriminatory wage rates for both new and incumbent employees on the basis of sex. It will be recalled that this claim cannot prevail on motion for summary judgment unless the evidence shows that jobs performed by male and female employees "requires equal skill, effort, and responsibility". 29 U.S.C. § 206(d). Having failed to adduce such evidence, plaintiffs' request must be denied. See Part IV, 2, D.

Second, plaintiffs contend that Local No. 65 negotiated rules for bidding, bumping, and disqualification which discriminate against female employees because of their sex. These rules have been examined by the court and, although facially neutral, were found to operate in a discriminatory fashion.[31] In large part, this is due to Uniroyal's classification and restriction

---

**29.** Defendant states that the discriminatory requirement of "previous experience" is valid because a female employee can bump into jobs traditionally reserved for male workers by following one of the alternative nondiscriminatory routes. Uniroyal's position, if accepted, would produce anomalous results under Title VII. It would permit an employer to retain and implement discriminatory provisions in a collective bargaining contract so long as nondiscriminatory alternatives existed. Such an outcome directly contravenes the intent of Congress to alleviate *all* employment preferences based on sex, except those grounded upon bona fide occupations qualifications or mandated by business necessity. *See* Note 1, *infra*.

**30.** Plaintiffs may pursue both causes of action since the doctrine of election of remedies does not bar an aggrieved party from simultaneously seeking relief under the N.L.R.A. and Title VII. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). However, if certain employment practices are violative of Title VII, it does not necessarily follow that such conduct is also violative of the N.L.R.A. *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975).

**31.** The validity of the rules from 1968 to 1970, however, cannot be determined at this time.

of jobs according to sex. The question, therefore, is whether a union violates its representation duty when it negotiates a labor contract which is fair in form, but which operates to the detriment of female employees. Although the cases referred to the court involve labor contracts containing facially discriminatory provisions, this court is unable to discern any meaningful distinction between a labor contract which, on its face, is discriminatory, and one which has the appearance of fairness but discriminates nonetheless. See, Glus v. Murphy, supra. Thus, the court concludes that Local No. 65 failed to meet its duty of fair representation by negotiating rules which had the effect of segregating job opportunities on the basis of sex.[32]

■ Finally, plaintiffs contend that Defendant Union breached its representational duty by acquiescing in Uniroyal's practice of discriminating against its members according to sex with respect to job assignments, promotions, transfers, recalls and terminations.[33] The issue to be resolved is whether a union's acquiescence in an employer's wrongful practices is grounds for a violation of duty of fair representation. Although the case law is not in total agreement, this court is convinced that the conclusion reached in Macklin v. Spector Freight, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979 (1973) represents the better view. There, Judge J. Skelly Wright, speaking for the undivided court stated:

A union's duty, in representing its members and protecting them from invidious treatment, must certainly be broader than simply refusing to sign overtly discriminatory agreements. Where blacks are in a minority, as they so often are in large industrial unions like the Teamsters, tacit union acquiescence in an employer's discriminatory practices effectively produces the same end result that was condemned in Steele. One means of avoiding this outcome, short of forcing the individual member to the recourse of time-consuming litigation against the employer, is for the union, in its vital role as bargaining agent, to negotiate actively for nondiscriminatory treatment in aid of its black members.

Id. at 79, 478 F.2d at 989; see also, Peters v. Missouri-Pacific R.R. Co., 483 F.2d 490, 498 (5th Cir. 1973); but see, Atkinson v. Owens-Illinois Glass Co., 10 FEP Cas. 710 (N.D.Ga. 1975). Macklin therefore requires a labor representative to resort to the bargaining table to obtain nondiscriminatory treatment of its female membership. The onus is placed upon the union rather than its constituents to obtain equal treatment.

■ This court has already determined that since 2 July 1965 Uniroyal has maintained a variety of employment policies which discriminated against the female class because of sex. Acquiescence by Local No. 65 in those unlawful policies, therefore, constitutes an encroachment of its duty of fair representation.

---

**32.** Contrary to Defendant Union's contention, this result is not inconsistent with the principle of majority rule which is such an important part of an employee's rights under the N.L.R.A. See, Emporium Capwell Co. v. Western Addition Community Organization, 420 U.S. 50, 61–65, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975). That is, a labor representative may not defend a bargaining agreement which in operation discriminates according to sex on the grounds that a majority of its members approved of such provisions. Although Congress has given unions broad discretion to select their own policies and rules, it did not "authorize a tyranny of the majority over minority interests". Ibid. at 64, 95 S.Ct. at 985. Consequently, a union may not choose a position which interferes with a "policy Congress had imbedded in the labor laws." Scofield v. N.L.R.B., 394 U.S. 423, 430,

89 S.Ct. 1154, 1158, 22 L.Ed.2d 385 (1969). Clearly, the elimination of sex discrimination is one such policy. The Supreme Court has remarked that "[i]n [enacting] the Civil Rights Act of 1964 . . . Congress indicated that it considered the policy against discrimination to be of the 'highest priority'." Alexander v. Gardner-Denver Co., 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1973); See, Bowe v. Colgate-Palmolive Corp., 416 F.2d 711, 719–20 (7th Cir. 1969). A union is therefore not free to negotiate terms which operate unequally on the basis of sex merely to please the majority of its members.

**33.** The court's remarks are, of course, limited to those practices found to be discriminatory as a matter of law.

■ Lastly, plaintiffs contend that by negotiating bidding, bumping and disqualification rules which have the effect of restricting a female's job opportunities in the plant, the Union also violated Title VII. In *Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant*, 491 F.2d 1364 (5th Cir. 1974), the court stated that "it would be difficult to fasten liability on one party to the labor contract which was a substantial cause of the discriminatory employment practices and grant total immunity from such liability to the other party." *Id.* at 1381. It is clear then, that each participant to the various agreements now at issue must bear the same responsibility under Title VII for the ultimate consequences of their joint efforts. Therefore, liability against the Union may also be established pursuant to 42 U.S.C. § 2000e *et seq.* (1970).

■ The same result must similarly obtain with respect to allegations of union acquiescence in Uniroyal's discriminatory policies and procedures. The Act clearly places an affirmative duty upon a labor organization to alleviate sex discrimination in employment. Such action must be initiated whether or not a female employee complains to the Union of discriminatory conduct. *See, e. g., Myers v. Gilman Paper Co.*, 392 F.Supp. 413, 420 (S.D.Ga.1975):

### VI—MOTION FOR PRELIMINARY INJUNCTION

■ Section 2000e–5(g) reads in pertinent part:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging [34] in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate . .

Issuance of a preliminary injunction is a matter which lies within the sound discretion of the trial judge; thus, a court's decision to grant or deny a preliminary injunction may be reversed on appeal only when the decision is tantamount to an abuse of discretion. The factors to be considered by a district court are mentioned by Professor Wright in his treatise, *Federal Practice & Procedure*, § 2948 pp. 430–31 (1973); they include:

(1) the significance of the threat of irreparable harm to plaintiff if the injunction is not granted;

(2) the state of the balance between this harm and the injury that granting the injunction would inflict on defendant;

(3) the probability that plaintiff will succeed on the merits; and

(4) the public interest.

■ Having considered the criteria in the context of this case, the court concludes that issuance of a preliminary injunction is proper. The requisite injury has been demonstrated; *United States v. Hayes International Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969) and *United States v. Virginia Elec. & Power Co.*, 327 F.Supp. 1034 (E.D.Va.1971); neither defendant alleges that plaintiffs' request will have an injurious impact upon them; liability with respect to the plaintiff class has been established; and the importance of the public interest at stake is evident from the statute itself.

The remaining issue, therefore, concerns the terms of the order. Section 2000e–5(g), which authorizes a court to enjoin and "order such affirmative action as may be appropriate," must be broadly construed so that discriminatory employment practices may be effectively terminated and aggrieved parties made whole. *Rosen v. Public Service Elec. & Gas Co.*, 477 F.2d 90 (3d Cir. 1973); *Bowe v. Colgate-Palmolive Corp.*, 416 F.2d 711, 719–20 (7th Cir. 1969). It is the court's conclusion that the following provisions will effectuate the purpose of the act without imposing an undue burden upon either defendant:

*United Airlines, Inc.*, 444 F.2d 1194 (7th Cir. 1971).

**34.** "Intentionally engaging" in an unlawful employment practice is defined as conduct which is deliberate rather than accidental. *Sporgis v.*

A—Defendant Uniroyal is hereby enjoined from continuing to follow its discriminatory rules for bidding, bumping, and disqualification during the pendency of this case. The Company shall permit any female hereinafter determined by the trier of fact to have been wrongfully disqualified from a traditionally designated "male" job (1) to return to the last job she held successfully and which is still being operated within the plant, or (2) to bid on any posted job without restriction, or (3) to accept placement by the Employment Office on an "open" job.

B—Defendant Uniroyal is hereby ordered to make the following announcement immediately to all of its management, supervisory, and wage personnel at the Mishawaka plant:

1. The Company today has abolished its segregated and discriminatory employment system at the Mishawaka plant.

2. The Company has discontinued classifying any of the jobs at the plant as "male" jobs or "female" jobs or as "Class A" jobs or "Class B" jobs.

3. The Company no longer classifies its employees as "Class A" employees or "Class B" employees.

4. There no longer are any jobs in the plant that should not be performed by female employees.

5. All jobs in the plant are equally available to all employees on the basis of their seniority and ability to do the work, without regard to sex.

6. The Company encourages female employees to exercise their seniority to bid and bump into traditionally "male" jobs as well as traditionally "female" jobs and new jobs.

7. Any female employee who is wrongfully disqualified from any traditionally "male" job shall be allowed (a) to bump back into the last job she held successfully and which is still being operated in the plant, or (b) to bid on any posted job without restriction, or (c) to accept placement by the Employment Office in an "open" job.

8. The Company guarantees full equality of employment opportunity at the plant to every employee on the basis of seniority and ability, regardless of sex.

C—Defendant Union is hereby ordered to make the same announcement to its members, together with the statements that the Union encourages female employees to bring any complaints of employment discrimination at the plant to the attention of the officers of the Local.

D—Defendant Uniroyal is hereby offered to file with the court by the tenth (10th) day of each month during the pendency of this case, the following information:

1. A report of every instance during the preceding month in which the Defendant Company has disqualified any female employee from any job other than a traditionally "female" job or "Class B" job and containing (a) the female employee's name, (b) the date she applied for the job, (c) the date she entered the job and the manner (whether by bid, bump, placement, or otherwise), (d) the date and reason she was disqualified, (e) the name of the management or supervisory employee who disqualified her, and (f) her present job.

2. A report showing the number of male and female employees in each department at the plant during the preceding month.

3. A chronological list showing the name, sex, and seniority date of each employee laid off and each employee recalled from layoff during the preceding month.